**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| BLACK FARMERS AND | ) | |
| AGRICULTRALISTS ASSOCIATION, | ) | |
| INC., A Delaware Corporation, | ) | |
| A Public Association Representing | ) | |
| America's Black Farmers, On Behalf | ) | Civil Action No. 1:04CV01561(PLF) |
| Of All Putative Class Members | ) | |
| And Itself, By and Through Its | ) | |
| President, Thomas Burrell; | ) | |
| 5 North 3rd St., Suite 2039 | ) | |
| Memphis, Tn. 38103 | ) | |
| 901-725-8580 | ) | |
| | ) | |
| ROBERT WILLIAMS, Individually | ) | EQUAL PROTECTION OF THE LAWS, |
| and as Class Representative; | ) | DUE PROCESS, FOURTEENTH |
| PO Box 178, Roscoe, Tx. 79525 | ) | |
| 325-766-3711 | ) | |
| | ) | AMENDMENT, US CONSTITUTION |
| LAVERNE WILLIAMS, Individually | ) | |
| and as Class Representative; SAME | ) | EQUAL CREDIT & OPPORTUNITY |
| | ) | ACT, 15 USC § 1691(e) |
| MICHAEL STOVALL, Individually | ) | |
| and as Class Representative; | ) | |
| 2881 County Rd. # 262, | ) | CONSPIRACY TO INTERFERE WITH |
| Town Creek, Al., 35672 | ) | |
| 256-685-9490 | ) | |
| | ) | CIVIL RIGHTS, 42 USC § 1985 |
| DEXTER DAVIS, Individually and | ) | |
| As Class Representative; | ) | ADMINISTRATIVE PROCEDURES |
| Rt. 1, Box 240, | ) | |
| Soundheimer, La. 71276 | ) | |
| 318-552-9109 | ) | ACT, 5 USC § 706 |
| | ) | |
| PHYLLIS DAVIS, Individually and | ) | |
| As Class Representative; | ) | EQUAL ACCESS TO JUSTICE ACT |
| | ) | 42 USC § 1988 |
| | ) | |
| GEORGE HILDERBRANDT, | ) | |
| Individually and as Class | ) | |
| Representative; | ) | |
| 34324 159th St. | ) | |
| Lavenworth, Kansas 66048 | ) | |
| RODNEY BRADSHAW, | ) | |
| Individually and as | ) | |

1

Class Representative,                    )
704 Clay                                 )
Jetmore, Kansas,  67854                  )
                                         )
CHARLIE SCOTT, Individually and          )
As Class Representative                  )
1259 Monk House Rd.                      )
Summerville, Tn.  38069                  )
(901) 465-5789                           )
                                         )
BURNIS TURNER                            )
Individually and as                      )
Class Representative;                     )
4333 FM 514                              )
Point, Texas 75742                       )
                                         )
LARRY THOMAS, Individually               )
and as Class Representative              )
109 State St.                            )
Earl, Arkansas, 72331                    )
870-792-0786                             )
                                         )
EDDIE SLAUGHTER, Individually            )
and as Class Representative              )
524 Aldridge Rd.                         )
Buena Vista, Georgia 31803               )
(229) 649-6410                           )
                                         )
                                         )
GEORGE HALL, Individually                )
and as Class Representative              )
County Rd. 133, Rt. 2, Box 163-A         )
Boligee, Al. 35442                       )
                                         )
WALTER POWELL,                           )
Individually and as                      )
Class Representative;                     )
                                         )
            PLAINTIFFS AND                )
            ALL SIMILARLY                 )
            SITUATED BLACK                )
            FARMERS,                      )
                                         )
.                                        )
                                         )
v.                                       )
ANN VENEMAN, Secretary,                  )

2

United States Department )
of Agriculture (USDA), )
)
VERNON PARKER, USDA )
Assistant Secretary for Civil Rights; )
)
PAUL GUTIERREZ, USDA Deputy )
Assistant Secretary for Civil Rights; )
)
NANCY BRYSON, USDA )
General Counsel; )
)
J. MICHAEL KELLY, USDA )
Associate USDA General Counsel; )
)
SAUDNA TRUE, Former Deputy )
USDA Associate General Counsel )
For Civil Rights, Director, USDA )
Office of Civil Rights; )
)
CHARLES PIERSON, CHIEF, )
OCR Program Complaints Division )
USDA Office of Civil Rights; )
)
J.P. PENN, USDA Under Secretary )
For Foreign and Agricultural )
Services; )
)
JAMES LITTLE,USDA Farm Service )
Agency Administrator; )
)
ALL IN THEIR OFFICIAL AND )
INDIVIDUAL CAPACITIES; )
)
       DEFENDANTS. )

## **FIRST AMENDED ORIGINAL COMPLAINT**

NOW COME ALL PLAINTIFFS, as listed in the above styled cause, Individually and as

Class Representatives of all similarly situated Black Farmers and file this their First Amended

Original Complaint against all DEFENDANTS, as listed in the above styled cause, in their Official

and Individual Capacities and would show upon the Court the following:

3

## I.

The purpose for amending the Original Complaint is to amend the Plaintiffs' list by deleting some but not all named Plaintiffs and proposed Class Representatives and adding new Plaintiffs and proposed Class Representatives to the action.

The following Plaintiffs and proposed Class Representatives are pursuing individual actions and inform the Court, via this filing, that they wish to maintain their individual actions distinct and separate from the matter at bar. Therefore, the following Plaintiffs and proposed Class Representatives are deleted from this lawsuit and each will maintain their captioned actions as follow:

1.   Robert Williams and LaVerne Williams
     P. O. Box 178
     Roscoe, TX  79525

     ***Williams, et al v. Veneman, et al***  1:03cv02245 (CKK)

2.   Michael Stovall
     2881 County Rd. #262
     Town Creek, AL 35672

     ***Stovall v. Veneman, et. al***   1:04:cv00319 (RMC)

3.   Dexter Davis and Phyllis Davis
     Rt. 1, Box 240
     Soundheimer, LA  71276

     ***Davis, et al v. Veneman, et al***  1:04cv 02309  (RWR)

4.   George Hildebrandt
     34324 159th Street
     Leavenworth, KS  66048

     ***Hildebrandt, et al v. Veneman***   1:04cv 01423 (PJF)

5.   Rodney Bradshaw
     704 Clay
     Jetmore, KS  67854

***Bradshaw v. Veneman***  1:04cv01422  (PJF)

6.     George Hall
       County Rd. 133, Rt. 2, Box 163-A
       Boligee, AL  35442

       ***Hall v. Veneman (N.D. La.)***

7.     Richard Grant
       Tillery, North Carolina

       ***Grant, et al v. Veneman,***   1:03cv02308 (JR)

The following individuals, all of whom are represented by the undersigned, are added as

individual Plaintiffs and as Class Representatives:

1.     Nancy V. Adams
       411 Drayton Street
       Manning, SC 29102
       803-435-4719
       Alt. Phone: 803-435-9724

2      Gladys W. Addison
       141 Hoyt Street
       Sumter, SC 29150


3.     Gloria Addison
       134 Little John Lane
       Sumter, SC 29153
       803-778-1634

4.     Abraham Alston, Sr.
       4145 Furman Field Road
       Rembert, SC 29128
       803-499-3151

5.     John P. Alston
       1020 Concord Circle
       Sumter, SC 29153
       803-495-8247

6.     Emma Banks

5

45 Wen-Le Court
Sumter, SC 29150
803-773-2564

7.    Charlese Barham
      1234 Tomahawk Street
      Hemingway, SC 29554
      843-558-5776

8.    Willie A. Battle
      421 Morris Street
      Lake City, SC 29560
      843-394-1415

9.    Harry Black
      1173 James Martin Road
      Manning, SC 29102
      803-473-4748

10.   Elbert Bolton
      390 Spring Street
      Swanson, SC 29160
      568-3932

11.   William C. Boone
      775 Foxworth Mill Road
      Sumter, SC 29153
      803-469-4176

12.   Roosevelt Bozie
      1149
      Sumter, SC 29153
      478-2740

13.   Hallieque D. Bradford
      298 S. Beth3a Road
      Lake City SC 29560
      843-389-7252

14.   Perscilla R. Bradley
      20 Gates Street
      Sumter, SC 29150
      803-773-6530

15.   Juanita G. Britton
      P. O .Box 117
      Rembert, S.C. 28128

6

803-432-6717

16.     Dorothy Ann Brooks
        195 Praylou Road
        Wedgefield, SC 29168
        803-494-9881

17.     Jimmie Earl Brooks
        199 Praylou Road
        Wedgefield, SC 29168
        803-449-9881

18.     Delmaree Brown
        P. O. Box 917
        Kingstree, SC 29556
        843-355-22525

19.     Donnie Brown
        P. O .Box 778
        North, SC 29112
        247-5539

20.     Geraldine M. Brunson
        443 Dogwood Drive
        Sumter, SC 29150
        803-775-4721

21.     Harry Brunson
        443 Dogwood Drive
        Sumter, SC 29150
        803-775-4721

22.     Caroline D. Budden
        571 McCray Mill Road
        Sumter, SC 29150
        803-775-8080

23.     Thomas H. Budden
        569 McCrays Mill Road
        Sumter, SC 29150
        803-775-1997

24.     Thomas H. Budden, Jr.
        72 Albert Spear Drive
        Sumter, SC 29150

803-773-0404

25.     Willie Budden, Jr.
        Ivan Buren Street
        Sumter, SC 29150
        803-775-9679

26.     Herbert Burgess, Sr.
        124 Lake Street
        Lake City, SC 29560
        843-394-3282

27.     Robert Butler, Jr.
        1297 White Tail Lane
        Sumter, SC 29148
        478-8734

28.     Allie Christine Cameron
        2733 Huggins Road
        Lake City, SC 29560
        843-389-4312

29.     Minnie Reese Caralina
        1058 Robin Hood Avenue
        Sumter, SC 29153
        803-773-7875

30.     Georgia M. Clark
        3218 S. Darllington Hwy.
        Sumter, SC 29153
        803-453-5956

31.     James & Phyllis Clark
        3275 S. Darlington Hwy.
        Sumter, SC 29153
        803-453-5369

32.     Freddie M. Clea
        P. O. Box 254
        Remert, SC 29128
        803-499-9701

33.     James L. Clea
        P. O .Box 254
        Remert, SC 29128

803-499-9701

34.     Albertus Conyers
        2685 Crown Drive
        Manning, SC 29102
        473-4379

35.     Annie Brown Cooper
        1197 Bartella Roaed
        Hemingway, SC 29554
        843-558-3780

36.     Ella Mae Cooper
        29 Remembrance Drive
        Lake City, SC 29560
        843-382-5617

37.     John S. Cooper
        1197 Bartells Road
        Hemingway, SC 29554
        843-558-3780

38.     Juanita Cooper
        29 Remembrance Drive
        Lake City, SC 29560
        843-382-5617

39.     Getty A. Davis
        1875 Fletcher Drive
        Sumter, SC 29153
        803-495-8268

40.     Harry Lee Davis
        12 James Haskell Road
        Wedgefield, SC 29168
        803-494-5910

41.     Mary Louise Davis
        12 James Haskel Road
        Wedgefield, SC 29168
        803-494-5910

42.     Frances Dean
        1226 Swimmingpin Road
        Mayesville, SC 29104

453-5107

43.     Arie B. Dow
        2077 Greenville Circle
        Sumter, SC 29150
        803-773-3588

44.     Annie Dozier
        (no intake sheet)
        803-473-2450

45.     Esther M. Dozier
        1420 Yellowbank Lane
        Manning, SC 29102
        803-473-2445

46.     Nellie J. Dubose
        72 Albert Spears Drive
        Sumter, SC 29150
        803-778-8178

47.     Annie M. Edmonds
        2100 Avenue A
        Mayesville, SC 29104
        803-453-5962

48.     Elouise Evans
        436 Loring Place
        Sumter, SC 29150
        803-773-2669

49.     Georgie W. Evans
        1254 Swimmingpin Road
        Mayesville, SC 29104
        803-453-5107

50.     Johnnie L. Favor
        2441 Pine Plain Road
        Swansea, SC 29160
        803-568-3271

51.     Joann Ferrell
        925 Miller Road
        Sumter, SC 29150

778-9981
Alt. Phone: 773-1602

52.    Estate of Allen Fleming
       By Eulia G. Fleming
       P. O. Box 311
       Summerton, SC 29148
       803-452-5828

53.    Eulia G. Fleming
       P. O. Box 164
       Pinewood, SC 29125
       803-452-5828

54.    Lillian B. Fleming
       P. O Box 164
       Pinewood, SC 29125
       803-452-5828

55.    Vander S. Fleming
       P. O .Box 5912
       Manning, SC 79102
       803-473-4780
       Alt. Phone: 803-225-0161

56.    Debra Franklin
       81 Segres Road
       Kingstree, SC 29556
       843-359-7998

57.    Maggie Fulton
       48 Sherwood Swtreet
       Kingstree, SC 29556
       843-382-8185

58.    Louise L. Gamble
       P. O. Box 1355
       Summerton, SC 29148
       803-478-2257

59.    Clemitine A. Gee
       2714 Gee Lane
       Effingham, SC 29541
       843-661-6345

60.     Gwendollyn P. Gee
        3015 Cal Lane
        Timmonsville, SC 29541
        843-667-9946

61.     Mary Alice Gee
        3539 Savannah Grove Road
        Effingham, SC 29541
        843-662-8390

62.     Ned W. Gee, Jr.
        2724 Gee Lane
        Effingham, SC 29541
        843-667--4132

63.     Ned W. Gee, III
        6010 Red Wolf Place
        Waldorf, MD 20600
        301-932-5931

64.     Ruby Gibson
        1002 East Sherwood Drive
        Sumter, SC 29153
        803-773-4935
        Alt. Phone: 803-934-0522

65.     Belva Gordon
        515 Madison Avenue
        Kingstree, SC 29556
        843-355-2402

66.     Kenneth Graham
        3012 Cal Lane
        Timmonsville, SC 29161
        843-661-0843

67.     Ida Nadelle Green
        149 Trio Road
        Andrews, SC 29510
        387-6302

68.     Larry Green
        P. O. Box 462
        Swansea, SC 29160

568-2489
Alt.phone: 568-3007

69.    Dewey C. Hamilton, Sr.
2324 Hamilton Road
Manning, SC 29102
803-473-2966

70.    Rosa Ann Harvin
384 Eugene Street
Sumter, SC 29153
775-3413

71.    Catherine Henry
1285 Lewis Road
Sumter, SC 29164
803-778-2275
Alt. Phone: 803-316-3711

72.    Raymond Holliday
311 Brunson Street
Manning, SC 29102
803-435-9263

73.    Willie Holliday
623 Sykes Street
Manning, SC 29102
803-435-9263

74.    Earthey Mae Holmes
951 Houck Street
Sumter, SC 29150
803-773-1163

75.    Louise James
P. O. Box 225
Pinewood, SC 29125
803-452-5543

76.    George Ann Johnson
5315 Liberty Hill Road
Summerton, SC 29148
803-478-4312

77.     Bessie Jones
        420 Bergen
        Newark, NJ
        973-242-2762

78.     Ernest & Myrteen King
        6985 Camden Harey(?)
        Rembert, SC 29128
        803-499-4811

79.     Patty King
        8537 Hemingway Highway
        Kingstree, SC 29556
        382-5071

80.     Gladys D. Kirkland
        5260 Dais Road
        Rembert, SC 29128
        803-499-5559

81.     Louise Kirkland
        5240 Dais Road
        Rembert, SC 29128
        803-499-5559

82.     Thomas Kirkland, Sr.
        5240 Dais Road
        Rembert, SC 29128
        803-499-5559

83.     Vermelle Kirkland
        5150 Dais Road
        Rembert, SC 29128
        803-499-4802

84.     Melvin Lampkin
        2102 Kingstree Highway
        Manning, SC 29102
        803-473-3365
        Alt.phone: 803-968-3165

85.     Hallie Law
        103 North Gugnard
        Sumter, SC 29150

803-773-3594

86.    James Law
       P. O. Box 282
       Sumter, SC 29168
       803-494-9033

87.    Stephen Law
       P. O. Box 282
       Sumter, SC 29168

88.    Helen M. Lawson
       1857 Hurricane Falls Lane
       Pinewood, SC 29125
       803-478-2257

89.    Fletcher Leaf, Jr.
       3005 London Road
       Sumter, SC 29153
       803-495-3518
       Alt. Phone: 803-495-2631

90.    Inez Leaf
       1675 London Road
       Sumter, SC 29153
       803-495-3057

91.    Virginia W. LeNeau
       315 Branmd Street
       Sumter, SC 29150
       803-773-2345

92.    Shirley J. LeSane
       4940 Florence Highway
       Mayesville, SC 29104
       803-453-5524

93.    James W. Levine, Sr.
       3090 Carter Road
       Sumter, SC 29150
       903-469-2236

94.    Helen Lewis
       640 Mims Road
       Sumter, SC 29153

803-495-2537

95.     Sam Lewis
        660 Mims Road
        Sumter, SC 29153
        803-773-8162

96.     Ada B. Linton
        (Deloris L. Nickelson [POA])
        740 Longwood Drive
        Sumter, SC 29154
        803-481-3522

97.     Jersey Logan
        5085 Highway 15 South
        Manning, SC 29102
        803-481-5871

98.     Arthur McClanahan
        3960 Ramsey Road
        Sumter, SC 29154
        803-481-3522

99.     Eliza P. McClanahan
        3960 Ramsey Road
        Sumter, SC 29154
        803-481-3522

100.    Barbara McCray
        1058 Thorne Avenue
        Kingstree, SC 29556
        843-354-7297

101.    Nathan McCrea
        1036 Red Road
        Kingstree, SC 29556
        843-382-8950
        Alt.phone: 843-382-4963

102.    Geraldean McCullough
        81 Segres Road
        Kingstree, SC 29556

843-354-9105

103.   Donna McDuffie
71 Spann Road
(?), SC 29150
803-459-4375
Alt.phone: 803-428-6547

104.   Charles McElveen
147 Joy Drive
Olanto, SC 29114
843-659-3671

105.   Dallas McElveen
P.O.Box 545
Olant, SC 29114
843-394-7472

106.   Carrie J. McFadden
391 Seminole Road
Sumter, SC 29150
803-481-3514
Alt.phone: 803-775-4721

107.   Ida S. McFadden
217 Brent Street
Sumter, SC 29150
803-773-2905

108.   Malachi McFadden
138 Lincoln Drive
Kingstree, SC 29556
843-382-9156

109.   Willie James McFadden
1056 Mickey Street
Turbeville, SC 29162
843-659-4191
Alt.phone: 843-394-0621

110.   Ethellen McKnight
61 Sherwood Street
Kingstree, SC 29556

843-382-3333
Alt. Phone: 843-382-6968

111.   Raymond L. Mack
       650 East Pike Road
       Sumter, SC 29150
       803-316-3283

112.   Viola Miller
       1352 Dais Road
       Rembert, SC 29128
       803-499-2353

113.   Ethel Minter
       1259A Bethel Highway
       Manning, SC 29102
       803-452-5681

114.   Dolly Mitchell
       1936 White & Rivers Road
       Pinewood, SC 29125
       803-452-5383

115.   Larry Moore
       1257 Whitehall Sores Road
       Florence, SC 29501-8469
       843-662-8830
       Alt. Phone: 843-206-2285

116.   Howard Murray
       505 Alt Avenue
       Sumter, SC 29150
       773-5658
       Alt. Phone: 972-6871

117.   Johnell Myers
       P. O. Box 42
       Lake City, SC 29560
       843-394-3043

118.   Deloris L. Nickelson
       740 longwood Drive
       Sumter, SC 29150
       803-481-9689
       Alt. Phone 803-316-4716

119.   Robert E. Nickelson
       740 Longwood Drive
       Sumter, SC 29154
       803-481-9689

120.   Deana Osborne
       1089-A Alice Drive
       Sumter, SC 29150
       803-481-5435

121.   Joyce G. Perkins
       3513 Savannah Grove road
       Effingham, SC 29541
       843-667-8390

122.   Pharis A. Pinckney, jr.
       207 South Pecan Road
       Lake City, SC 29560
       843-389-9880

123.   Shirley F. Pinckney
       207 South Pecan Road
       Lake City, SC 29560
       843-389-9880

124.   Lue Rovenia Pitt
       Sumter, SC 29154

125.   Dumont L. Pleasant
       6040 Dumont Lane
       Pinewood, SC 29125
       803-452-6121

126.   Gloria L. jPleasant
       8270 Milford Plantation Road
       Pinewood, SC 29125
       803-452-5047

127.   Ola Mae Potts
       748 Branch
       Sumter, SC 29150
       803-775-4435

128.  Maudine Presley
      26 East Patricia Drive
      Sumter, SC 29150
      803-775-6544
      Alt. Phone:803-778-1555

129.  Francena Pressley
      605 Promise Land Road
      Kingstree, SC 29556
      843-382-5898

130.  Ruthie Mae Prince
      383 Curtis Drive
      Sumter, SC 29153
      803-778-2759

131.  Berine Pringle
      525 Arlington Road
      Sumter, SC 29153
      803-469-8129

132.  Pearl Pringle
      525 Arlington Road
      Sumter, SC 29153
      469-2993

133.  Robert L. Pringle
      525 Arlington Road
      Sumter, SC 29153
      803-469-8129

134.  Ida J. Ragin
      6609 Tobias Road
      Manning, SC 29102
      803-473-2595

135.  Roger B. Ragin
      504 Alpine Drive
      Sumter, SC 29154
      803-778-2305

136.  George E. Ramsey
      1285 Lewis Road
      Sumter, SC 29154

803-778-2275

137.   Dorothy Richardson
       125 Bartlette
       Sumter, SC 29150
       778-5918

138.   Adrian Ridgill
       1359 Larrimore Drive
       Manning, SC 29102
       803-473-2395

139.   Dorcus S. Ridgill
       1359 Larrimore Drive
       Manning, SC 29102
       803-473-4959

140.   Charles Lee Riley
       3565 Rev. J. W. Carter Road
       Sumter, SC 29148
       803-473-4492

141.   Viola Riley
       3565 Rev. J. W. Carter Road
       Sumter, SC 29148
       803-473-4492

142.   Margaret L. Sanders
       490 Wilson Hall Road
       Sumter, SC 29150
       803-469-6887

143.   Hattie Scott
       261 Gamble Street
       Sumter, SC 29150
       803-775-7652

144.   Susan Scott
       242 Murphy Street
       Sumter, SC 29150
       803-773-5894

145.   Amelia D. Simon
       1155 Aignathser Lane
       Sumter, SC 29153

803-495-2005

146.    Willie A. Simon
5772 Kenwood Road
Manning, SC 29102
803-473-2354

147.    Carlette Simpter
3656 Nesmith Road
Nesmith, SC 29580
843-382-5023

148.    Alonza Singletary
820 Webb Street
Sumter, SC 29150
775-7693

149.    Bertha W. Singletary
212 King
Sumter, SC 29150
803-773-8535

150.    Bobby Singletary
P. O. Box 835
Lake City, SC 29560
843-389-0880

151.    Leo Singletary, Jr.
1418 Peacock
Scraton, SC 29591
389-6215

152.    Marilyn Singletary
P. O. Box 835
Lake City, SC 29560
843-389-0880
Alt. Phone: 843-210-7217

153.    Rebecca Singletary
60 Albert Spears Drive
Sumter, SC 29150
803-775-6723

154.    Willie James Singletary
260 Old Farm Road

Hemingway, SC 29554
843-558-3399

155.  Eliza F. Smith
      1150 Spike West, Apt. 207
      Sumter, SC 29154
      803-905-8066

156.  Lottie Spencer
      14 Hospital Circle
      Sumter, SC 29150
      803-775-9525

157.  Michael A. Stephens
      1244 Tomahawk Street
      Hemingway, SC 29554
      558-0017

158.  Brenda Stukes
      P.O.Box 1293
      Summerton, SC 29148
      803-478-5931

159.  Elijah Stukes
      495 Geddings Road
      Sumter, SC 29150
      803-481-0396

160.  Lillie Myrtle Stukes
      495 Geddings
      Sumter, SC 29150
      803-481-0396

161.  Mary Sutton
      2685 Trufield Drive
      Sumter, SC 29153
      803-469-7584

162.  Mozell Sweat
      431 Foxworth Street
      Sumter, SC 29150
      803-773-5708

163.  Wheeler Sweat, II
      431 Foxworth Street

Sumter, SC 29150
803-773-5708

164. Vertrena W. Thompson
2910 Danville Lane
Sumter, SC 29153
803-469-9727
Alt. Phone 773-3750

165. Dorothy W. Thorne
3800 French Williams Road
Sumter, SC 29153
803-495-2886
Alt. Phone: 803-436-1875

166. Octavia Tomlin
11 Brent Street
Sumter, SC 29150
803-773-1602
Alt. Phone: 778-9981

167. Norma Jean Townsell
7615 Hedgington Drive
Memphis, TN 38125
901-758-2541

168. Horace H. Wade
4000 Peach Orchard Road
Dalzell, SC 29040
803-499-1988

169. Simon R. Wade
4000 Peach Orchard Road
Dalzell, SC 29040
803-499-1988

170. Willie Walker, Jr.
3022 West Alligator Road
Effingham, SC 29541
l843-662-7038

171. Mary A. Walters
P. O. Box 3173
Sumter, SC 29151
803-934-9535

Alt. Phone: 803-773-3321

172.  Andrew Watson
      P.O.Box 654
      Pelion, SC 29123
      803-894-67129

173.  Michael White
      1224 Devonshire Drive
      Sumter, SC 29153
      803-778-4003
      Alt. Phone 803-316-7528

174.    Adam Williams
        4930 Silo Road
        Sumter, SC 29150
        803-481-4384
        Alt. Phone: 803-309-2985

175.    Hazel Williams
        2200 Old Georgetown Road
        Hemingway, SC 29554
        843-558-0338

176.    James Williams
        710 Swimming
        St. Charles, SC 29104
        453-4660
        Alt. Phone: 453-5771

177.    Lola B. Williamson
        3877 Thurgood Marshall Highway
        Kingstree, SC 29556
        843-382-5462

178.    Deloris Wilson
        P. O. Box 122
        Effingham, SC 29541
        843-665-5570
        Alt. phone: 843-346-2151

179.    Ella G. Wilson
        4745 Santee Road
        Lane, SC 29564
        843-387-6393

180.    Levi Presslely Wilson
        4745 Sarter Road
        Lane, SC 29564
        843-387-6393

181.    Ruth Wilson
        211 Dickson Street, #5C
        Manning, SC 29102
        803-435-6820

182.    Azalee Wright

745 Ranch Street
Sumter, SC 29150
803-773-3750
Alt. phone: 469-9727

183.   Gloria G. Wright
3521 Savannah Grove Road
Effingham, SC 29541
843-667-4132

184.   Cal Adams, deceased
(by Gloria G. Wright)
3521 Savannah Grove Road
Effingham, SC 29541
843-661-0704

185.   Yvette D. Wright
3012 Cal Lane
Timmonsville, SC 29161
843-661-0843

## **INTRODUCTION**

1.      ***"Forty acres and a mule."***   The historical basis of the preceding phrase, the United

States government's 19th century ***promise*** to the Freedmen, the former slaves and their heirs, has a

21st century life, a life laced with government-sanctioned deprivation of our country's cherished civil

rights and liberties as delineated in the Bill of Rights.[1]   The United States, as admitted by its

Secretary of Agriculture, Ann Veneman, has systemically and relentlessly exercised despicable and

repugnant discrimination against Black Farmers resulting in pain, suffering, distress, land loss and

death to Black Farmers that tried and, today, try to etch out a living on the land in their guaranteed

---

1 It is well established that the US Constitution Bill of Rights constitute two types of individual
protections - civil rights and civil liberties.  *Civil Rights* are those rights that the government is obligated to
protect between parties.  *Civil Liberties* are those same exact rights but the government is prohibited from

pursuit of life, liberty, happiness and ownership of property. Even more, the United States government and its USDA officials, the DEFENDANTS herein, have engaged and continue to engage in an institutional and insidious racism and conspiracy to interfere with the Black American Farmers' civil rights and liberties.

2.      To this day, the *promise* remains elusive for all Black Americans, Black American Farmers and their heirs, merely because of their race, Black.

3.      The racial hatred and animus perpetrated by the USDA, dubbed, "**The Last Plantation,"** persist like a plague. The DEFENDANTS, through intention, deceit, passivity, inaction and benign neglect, have knowingly allowed and even encouraged top government administrators and lawyers as well as local federal Farm Service Agency officials across this land to trample on the civil rights of the Class Representatives and to make a mockery of our precepts of freedom. DEFENDANTS, individually and jointly, knew or should have known that these blatant violations of law run rampant throughout every single agency in the mammoth USDA, "**The Last Plantation."** The DEFENDANTS have admitted their misdeeds and overt violations of law. Yet, they continue their terror against Black Farmers with an indescribable callous disregard, all in the face of judicial, legislative and public scrutiny.

4.      This action is brought to dispel the notion that the United States government and its USDA officials can further employ a repugnant racial animus in denying any American citizens, in this matter, Black Farmers and their heirs, the benefits of any federal program or activity on the basis of their race, *BLACK*, and to vindicate the Class Members' rights as guaranteed by the UNITED STATES CONSTITUTION.

---

infringing upon. (Citation omitted)  The USDA fails, intentionally and with malice, at both.

**II.**
**NATURE OF THE CASE**

5.      This case involves DEFENDANTS' administration, during the period January 1, 1997 to August 30, 2004, of the USDA and the applications by American Black Farmers for farm loans and credit and participation in federal farm programs, (referred to hereinafter as, generally, "farm programs").   PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS contend that DEFENDANTS, when processing applications of African-American farmers for farm programs (1) willfully discriminated against them, and (2) when, in response, PLAINTIFFS and all similarly situated black farmers filed written discrimination complaints with DEFENDANTS, DEFENDANTS failed, although required by, inter alia, the Civil Rights Act of 1964, the Equal Credit Opportunity Act and 7 C.F.R. §§ 2,28, 15.52 et. seq. to investigate the complaints.   For example, when African-American farmers filed complaints of discrimination with DEFENDANTS, DEFENDANTS willfully either (1) avoided processing and  resolving the complains by stretching the review process out over many years; (2) conducted a meaningless, or "ghost investigation", or (3) failed to do anything.   These two acts: (1) the discrimination in denial of the application and (2) the failure to properly investigate the discrimination complaints, deprived the African-American farmers, inter alia, of equal and fair access to farm credit and farm programs, and due process, resulting in damages to them.

6.      In May, 1997, DEFENDANTS' officials admitted that in early 1983, the Reagan administration had quietly disbanded and dismantled the civil rights enforcement arm at United States Department of Agriculture ("USDA") and that discrimination complaints had not been properly investigated since that time.   Two federal reports, issued in February, 1997, verified these facts.

7.     In the ***Pigford v. Veneman***  Black Farmers Class Action Complaint, related to the case brought here, a settlement agreement was reached resulting in the denial of benefits to thousands of Black Farmers who had filed or could have applications for credit and who filed complaints of discrimination during the period January, 1983 to December 31, 1996.

8.     Since the filing of the ***Pigford v. Veneman*** original complaint, 97cv01978 (PLF), numerous annual reports by the USDA's Office of Inspector General, US Civil Rights Commission, General Accounting Office, Equal Employment Opportunity Commission and private groups, i.e., the Environmental Working Group, have chronicled the treatment of Black Farmers beyond January 1, 1997, those PLAINTIFFS, Black Farmers and their heirs, who that now seek justice as the BFAA, Inc. (Post-***Pigford***) Class.

## III.
## JURISDICTION

9.     Jurisdiction is founded upon FOURTEENTH AMENDMENT[2], US Const.,   15 U.S.C.  §1691, *et seq*. 28 U.S.C. §1331, 28 U. S. C.  § 28 U.S.C. 2201, 42 U.S.C. §§ 1985, 1988 and 5 U.S.C. § 706.

## IV.
## VENUE

10.     Venue lies in this judicial district because the claim arose in this judicial district and pursuant to 28 U. S. C. § 1391(e)

## V.
## PARTIES

### ASSOCIATION

11.     PLAINTIFF BLACK FARMERS AND AGRICULTRALISTS ASOSCIATION,

INC. ("BFAA, Inc."), represented herein by and through its president, Tom Burrell, is a Delaware Corporation with its principle place of business in Memphis, Tennessee.  BFAA, Inc has state chapters throughout the United States, and it asserts associational standing to bring suit based on (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claims asserted nor the relief requested necessarily requires the participation of individual members in the lawsuit.  BFAA, Inc. asserts its claims in its own right and as a Representative of all other class members. ***NAACP v. Acusport Corp***., 210 FRD 446, 455, 457 (D. E.D.N.Y. 2002) (An organization bringing an action on its own behalf may assert claims regarding injury to its own interests or harm from DEFENDANTS' activities that "reduces membership dues or other contributions the organization may otherwise collect."); ***Warth v. Seldin,*** 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[a]n organization may assert standing on its behalf as well as on behalf of its members.").

### INDIVIDUAL PLAINTIFFS AND CLASS REPRESENTATIVES

12.     There are 190 Individual Class representatives, each of which falls under one of three subclasses.

(a)     Plaintiff and Class Representative Charlie Scott ("Scott") is a Black Farmer who farms in Fayette County, Tn.  Scott is a prevailing Pigford claimant who received the $50,000 cash payment in 2000.  Scott applied for a farm operating loan and/or credit in February 2001, and was denied the credit and operating because Defendants retaliated against Scott for filing a claim and receiving benefit there from. The denial of this credit was due to racial discrimination and reprisal against Mr. Scott. This was acknowledged at the

---

2 Made applicable to the United States through the FIFTH AMENDMENT, us const.

highest level of the agency. The rejection of the FO by the County Committee was directly counter to Agency regulations as well as to its own actions before and after the FO loan decision. Mr. Scott and thousands like him have suffered continued discrimination and reprisal, from 1997 thru 2004, even though they applied for the credit, was eligible for the credit and was denied such credit when white farmers received preferential treatment regarding such credit and loan extension.

(b)   Plaintiff and Class Representative Larry Thomas ("Thomas") is a farmer in Earl, Arkansas.  Thomas made application for a farm operating loan in February, 2000. Thomas received the farm operating loan, however, the loan was received in late July, two months too late for the planting season, and the loan was inadequate relative to the application made. Scott is now facing land foreclosure.  Thomas did not receive assistance as a socially disadvantaged farmer.  Thomas was qualified for an adequate loan, applied for an adequate loan and was denied an adequate a timely loan while white farmers received adequate loans, timely loans, and assistance from USDA county officials.

(c)   Plaintiff Walter Powell is a black farmer who resides in Monroe, Louisiana.  Plaintiff is but one of approximately three thousand (3000) or more black farmers who (a) attempted to apply or timely applied for loans and/or program payments with DEFENDANTS during the period of January 1, 1997 – August 30, 2004, was qualified for such credit and/or payments, yet denied and who was the subject of willful and continuous racial discrimination, and (b) timely filed a complaint or complaints with DEFENDANTS of these acts of discrimination. Said complaint(s) were never acted upon pursuant to the applicable law, causing this plaintiff and thousands of other black farmer substantial damages.  In

violation of Title VI and applicable regulations, 7 CFR §§ 2.28, 15.51, 15.52 et seq., and 5 USC § 706, Administrative Procedures Act, Defendant Parker, Assistant Secretary for Civil Rights, arbitrarily and capriciously dismissed, without acceptance and without investigation of the complaints, approximately 3000 individual complaints leaving the complainants no administrative remedy as authorized by law.

Each of the remaining Class members is an African-American farmer and resident of any one of the fifty states of the union who (a) timely applied for loans and/or program payments with DEFENDANTS during the period of January 1, 1997 – August 30, 2004, was qualified for such credit and/or payments, yet denied and who were the subject of willful and continuous racial discrimination, and (b) timely filed a complaint or complaints with DEFENDANTS of these acts of discrimination, which complaint(s) was/were never acted upon pursuant to the applicable law, causing the black farmers substantial damages.

## DEFENDANTS

13.     DEFENDANT ANN VENEMAN is Secretary of the United States Department of Agriculture ("USDA"), and is the federal official responsible for the administration of the statutes, regulations and programs which are the focus of this action. She may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through her agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001. DEFENDANT ANN VENEMAN may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

14.     DEFENDANT VERNON PARKER is the United States Department of Agriculture Assistant Secretary for Civil Rights and is the federal official delegated, by DEFENDANT VENEMAN the full responsibility to administer the USDA Civil Rights Program in accordance with federal statutes and regulations.  DEFENDANT PARKER may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001.  DEFENDANT VERNON PARKER may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

a.     DEFENDANT PAUL GUTIERREZ, is the United States Department of Agriculture Deputy Assistant Secretary for Civil Rights and is the federal official delegated, by DEFENDANTS VENEMAN and PARKER the full responsibility to administer the USDA Civil Rights Program in accordance with federal statutes and regulations.  DEFENDANT GUTIERREZ may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001.  DEFENDANT GUITIERREZ may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

b.     DEFENDANT NANCY BRYSON is the United States Department of Agriculture General Counsel.  DEFENDANT BRYSON may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of

Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001. DEFENDANT BRYSON may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

      c.     DEFENDANT J, MICHAEL KELLY is the United States Department of Agriculture Deputy General Counsel. DEFENDANT KELLY may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001. DEFENDANT KELLY may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

      d.     DEFENDANT SAUDNA TRUE is the United States Department of Agriculture former Deputy General Counsel for Civil Rights and the present Director of the Office of Civil Rights. DEFENDANT TRUE may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001. DEFENDANT TRUE may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

      e.     DEFENDANT CHARLES PIERSON is the United States Department of Agriculture Office of Civil Rights Chief Program Adjudicator. DEFENDANT PIERSON may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the

United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001.  DEFENDANT PIERSON may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

f.      DEFENDANT J. P. PENN  United States Department of Agriculture Under Secretary for Foreign and Agricultural Services.  DEFENDANT PENN may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001.  DEFENDANT PENN may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

g.      DEFENDANT JAMES LITTLE is the United States Department of Agriculture Farm Service Agency Administrator.  DEFENDANT LITTLE may be served with process by Certified Mail Return Receipt Requested, at 1400 Independence Avenue, S.W. Washington, D.C. 20250, and/or through his agent for service as provided by law, by serving the United States Attorney for the District of Columbia at Judiciary Center Building, 555 4th Street N.W. Room 5806, Washington, D.C. 20001.  DEFENDANT LITTLE may be served personal process at 1400 Independence Avenue, S.W. Washington, D.C. 20250.

## VI.
## FACTUAL BACKGROUND

A.   **HOW DEFENDANTS ARE ORGANIZED AND, GENERALLY, THE GOVERNMENT PROGRAMS AT ISSUE**

15.      USDA's Farm Service Agency ("FSA") provides commodity program benefits (such

as deficiency payments, price support loans, conservation reserve benefits), disaster payments, farm loans and other farm credit benefits to U. S. farmers.  The agency was created in 1994, as a result of a reorganization of USDA, primarily by the merger of the Agricultural Stabilization and Conservation Service ("ASCS", which previously had handled commodity program benefits, price support loans, CRP payments, disaster payments, and related services) with the Farmers Home Administration ("FmHA", which previously had provided farm loans and other farm credit benefits).

16.     The FmHA was created decades ago to provide loans, credit and technical assistance for formers.  FmHA made loans directly to farmers or guaranteed the loans made to farmers by private, commercial lenders.  These loans included "farm ownership", "operating", and "continuing assistance" loans, as well as loans that "restructure" existing loans and" emergency disaster" loans.

17.     ASCS was an agency of USDA created to provide services to U. S. farmers under the price support, deficiency payment, CRP, and related programs to stabilize farm income and prices, and to assist in the conservation of land.  It was consolidated into the Farm Service Agency in 1994.

18.     DEFENDANTS Veneman is responsible for the administration of the Farm Service Agency (FSA) and previously FmHA & ASCA.  FSA, like FmHA and ASCS before it, administers the federal farm programs through a three-tiered review system consisting of (a) county offices and committees, (2) state offices and committees, and (3) a federal level of review in Washington, D.C., the National Appeals Division ("NAD").  The local county committees consist of producers from a county who have been elected by other producers in that county; they oversee the county offices. The state committees consist of producers from each state selected by the Secretary of USDA; they oversee the state officers.  At the federal level NAD renders final determinations of administrative appeals. (Prior to the 1994 consolidation, FHA had its own administrative appeal process).

**B.**   **PROCEDURE BY WHICH FARMERS (1) APPLIED FOR LOANS AND CREDIT WITH FmHA AND (2) APPLIED FOR PARTICIPATION IN OTHER FARM PROGRAMS WITH ASCS**

19.     Traditionally, when a farmer applied for any FmHA loan or program, he went to his county office (formerly the FmHA office), and filled out a Farm and Home Plan (FHP), which required the assistance and guidance of DEFENDANTS' officials to complete.  Assistance and guidance was critical because of the complexity of the programs and forms.  This application process was done pursuant to regulations found at 7 C.F.R. §1910, et seq.) and Commodity Credit Corporation ("CCC") regulations (7 C.F.R. at §1400, et seq.).

20.     When the FmHA loan application with its supporting documents was completed it was presented to the county committee.  If approved, the loan was processed.  The Equal Credit Opportunity Act ("ECOA") prohibits discrimination in credit based on sex, marital status, race, color, age, or national origin, religion, etc. (15 U.S.C. §1691 (a) ).  If an FmHA loan was denied on discriminatory grounds, the farmer could file a complaint of discrimination with the Secretary of USDA, the FmHA – Equal Opportunity ("EO") office or with the Office of Civil Rights Enforcement and Adjudication ("OCREA"), or both.

21.     With respect to ASCS-type programs, the application was reviewed by the CED and then presented to the county committee.  If approved, the ASCS benefits were awarded.  Title VI of the Civil Rights Act of 1964 prohibits exclusion of participation I federal programs based on race, color or natural origin.  With respect to ASCS-type applications, if a farm program application was denied on discriminatory grounds, the farmer could file a complaint of discrimination with the Secretary of USDA or OCREA.

**C.**   **USDA NON DISCRIMINATION REGULATIONS   (7 C.F.R. §§ 2.28, 15.51 AND 15.52, AS AMENDED)**

22.     As early as 1966, which was eight years prior to ECOA's enactment, USDA promulgated internal management guidelines proscribing discrimination based on "race, color, religion, sex, age, disability, or national original" in the administration of any of its direct programs and activities.  *See* 7 C.F.R.  §§ 15.51, 15.52).  *See also* 31 Fed. Reg. 8175, 8175 (June 10, 1966). These guidelines have remained in effect continuous since then and include a voluntary administrative mechanism by which USDA receives complaints of discrimination involving *any* USDA program, including the farm credit and ASCS subsidy programs at issue in This case.  *See* 7 C.F.R. §15.52.   Under § 15.52(a), a person who believes he or she have been the victim of discrimination in programs conducted directly by USDA may file a complaint with USDA's Office of Civil Rights ("OCR") within 180 days from the date the person knew or should have known of the alleged discrimination. OCR then investigates the complaint and determines the corrective actions, if any, required to resolve it.  7 C.F.R. §15.52(b).  The regulation sets no deadline by which OCR must act on a complaint, it does not establish requirements for how an investigation should be conducted or a claim reviewed, and it does not require that USDA advise a complainant regarding the determination of, or corrective action taken in response to, her complaint.   USDA's decision to promulgate section 15.51 and 15.52 was a voluntary and unilateral one, *see* 54 Fed. Reg. 31,163, 31,163(July 27, 1989); 50 Fed. Reg. 25,687, 25,687(June 21,1985), and the filing of an administrative complaint under section 15.52 is not a prerequisite to filing suit against USDA under ECOA or any other statute.   Instead, section 15.52 was designed to enable USDA to police itself internally and correct any discriminatory conduct that might arise in programs USDA administers directly.  *See* 54 Fed. Reg. 31,163, 31,163-164(July 27, 1989) (citing 5 U.S.C. §301) *See also* 7

U.S.C. §15.50.  The USDA Office of Civil Rights has failed at its own regulations and intentionally violates all authorizing federal statutes.

23.      In an effort to give the USDA Civil Rights program more authority, the Congress authorized the creation of a new presidential appointee, Assistant Secretary for Civil Rights. President Bush nominated and the US Senate confirmed Mr. Vernon Parker as Assistant Secretary for Civil Rights on April 3, 2003.

**D.      THE USDA OFFICE OF CIVIL RIGHTS REFUSES TO EXECUTE THE LAW OF CIVIL RIGHTS; USDA/OCR: A DISMAL AND INTENTIONAL FAILURE**

24.      The USDA Office of Civil Rights, administered by DEFENDANTS PARKER, through Delegation of Authority from DEFENDANTS VENEMAN, has been consistently criticized by several government agencies, Equal Employment Opportunity Commission, US Commission on Civil Rights, etc., by Congressional committees and by its own Office of Inspector General for failing and refusing to conduct its administrative and  regulator authorities, timely, in good faith and in accordance with constitutional, statutory   This failure stems from the USDA's admitted shut down of the Office of Civil Rights by the Reagan White House to the benign neglect by DEFENDANTS  PARKER and VENEMAN who have failed, through acquiescence, omission and blatant intention, to settle one administrative complaint, among the thousands of pending complaints, by a minority farmer since DEFENDANT PARKER's appointment as the Assistant Secretary for Civil Rights.  DEFENDANT PARKER has refused and continues to refuse to exercise, to the detriment of PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS and others similarly situated[3], the Delegation of Authority in the Code of Federal Regulations, § 7 CFR,  which

---

3 On information and belief, DEFENDANT PARKER, with the tacit consent of DEFENDANT VENEMAN, on are about August 15, 2003, capriciously and arbitrarily dismissed approximately 3000

in detail delineates  the authority and conduct of the USDA's administrative civil rights program. PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS and thousands with similar situations have suffered, and in all probability will continue to suffer, as a result of detrimental reliance on DEFENDANTS PARKER and VENEMAN and their legally mandated, but non-implemented, administrative civil rights complaint and resolution process.  On information and belief, DEFENDANTS VENEMAN and PARKER have refused and continue to refuse to execute the law and regulations of the land in furtherance of their discriminatory and illegal attempt to destroy the black farm family.

**VI.**
**THE HISTORICAL OVERVIEW**
***PRE PIGFORD V. VENEMAN AND RESULTING CONSENT DECREE***

**A.**   **HOW PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS AND MEMBERS OF THE PIGFORD CLASS WERE DAMAGED; WHAT DEFENDANTS DID IN RESPONSE TO ALL COMPLAINTS OF DISCRIMINATION**

25.     Unbeknownst to all PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS and members of each Black Farmer Class, including the one at bar, DEFENDANTS disbanded the enforcement ability of EO and OCREA in 1983, leaving DEFENDANTS with no ability to investigate discrimination complaints.  In a May 25, 1997 <u>Richmond News Dispatch</u> Article and interview of Lloyd Wright, Director of USDA office of Civil Rights, Mr. Wright stated that (1) <u>no systematic probes or investigations had been taken since 1983, when the Reagan administration disbanded the Civil Rights investigative staff,</u> and (2) <u>that agency regulations and the provisions of the Civil Rights Act of 1964, et al. were violated.</u>   Further evidence of

---

administrative complaints of discrimination filed by black farmers employing a self-serving inter-office regulation that additional information had to be provided by the complainants within a legally unreasonable fifteen period.

---

DEFENDANTS' willful failure to investigate discrimination complaints is evident in the February 27, 1997,, Office of Inspector General Report ("OIG"), and the February, 1997 Civil Rights Action Team Report ("CRAT"), both explained below.

26.     The Department of Justice (DOJ) was required to ensure that Federal agencies met their Title VI enforcement obligations and provide civil rights protection to persons filing discrimination complaints in the FSA programs.  <u>DOJ failed to ensure that DEFENDANTS met its Title VI obligations</u>.

27.     Within USDA, The Policy Analysis and Coordination Center (PACC), an agency under the Assistant Secretary for Administration, was responsible for civil rights compliance and developing regulations for processing program discrimination complaints at USDA. [OIG Report, p.4] OCREA was responsible for processing program discrimination complaints received by USDA from participants in FSA programs.  [OIG Report, p.4]

28.     OCREA was required to forward written complaints form FSA program participants of discrimination to the appropriate agency with USDA asking the agency to attempt conciliation of the complaint.  If conciliation was not successful, the agency was to be instructed to perform a preliminary inquiry and make a recommendation of a finding of discrimination.  If conciliation was not successful, the agency was to be instructed to perform a preliminary inquiry and make a recommendation of a finding of "discrimination" or "no discrimination".  OCREA was to perform its own analysis of the complaint and the preliminary inquiry and make a recommendation to the Assistant Secretary for Administration on the finding of "discrimination" or "no discrimination".  <u>This process never occurred during the relevant period covered by this lawsuit.</u>  [OIG Report, p.4]

29.     FSA's Civil Rights and Small Business Staff (CR&SBUS) were responsible for

handling program discrimination complaints within FSA.

30.     The applicable State Civil Rights Coordinator in FSA was responsible for obtaining a conciliation agreement or performing a preliminary inquiry and forward it to CR&SBUS was to forward the agreement to OCREA and recommend the discrimination complaint be closed.  If a preliminary inquiry was performed, CR&SBUS would analyze the information and determine if discrimination was found;  CR&SBUS was to forward the preliminary inquiry and its analysis to OCREA with its determination.  These procedures were never and are not now properly followed.

31.     USDA has codified regulations, C.F.R., Part 15 – "Nondiscrimination" which states USDA's policy of nondiscrimination in federally assisted and conducted programs in compliance with Title VI of the Civil Rights Act of 1964.  The regulations should have served as a basis for civil rights compliance and enforcement with respect to participants in FSA programs, however, DEFENDANTS admits the regulations have long been and still are outdated and never reflected the departmental agencies, programs and law.  (emphasis supplied.) [OIG Report, p.5]

32.     USDA Regulation 4330-1, which is over 11 years old, dated June 27, 1986, set the departmental policy for program civil rights compliance reviews, but does not provide policy and guidance for processing program discrimination complaints. [OIG Report, p.5]

33.     On December 12, 1994, in a management alert to the ten Office of Civil Rights Enforcement, DEFENDANTS' Office of Inspector General (OIG) reported problems with how USDA received, processed, and resolved program discrimination complaints. OIG recommended that "a departmental regulation be promulgated that sets forth the authorities of the Office of Civil Rights Enforcement and that written procedures and controls be established governing the receipt, processing, and resolution of  program discrimination complaints within established timeframes".

[OIG Report, p.5]

34. <u>The regulation was never published.</u>

35. After years of abuse and benign neglect of African American farmers, OIG finally undertook an investigation and review, the results of which were released on February 27, 1997, of DEFENDANTS' program discrimination complaints within FSA as well as 10 other agencies within USDA. OIG found, <u>inter alia</u>, that the discrimination complaint process within USDA lacked "integrity," and "accountability" was without a tracking system, was in "disorder", did not resolve discrimination complaints, and had a massive backlog:

> The program discrimination complaint process at FSA <u>lacks integrity, direction and accountability</u>. The staff responsible for processing discrimination complaints receives little guidance from management, functions in the absence of any current position descriptions or internal procedures, and is beset with its own personnel EEO problems. <u>The staff also processes discrimination complaints without a reliable tracking system to determine the status of the complaints</u>, and, apparently, <u>without deadlines</u> to resolve the complaints. <u>The resulting climate of disorder has brought the complaint system within FSA to a near standstill</u>. Little gets accomplished to resolve discrimination complaints or to make program managers aware of alleged problems within their programs. After developing our own data base of unresolved cases, we determined that as of January 27, 1997, FSA had an outstanding backlog of 241 complaints." (Emphasis added) [OIG Report, p.6]

36. OIG found that the staff responsible for processing the discrimination complaints consisted of two untrained and unqualified people:

> The FSA staff responsible for processing discrimination complaints, the Civil Rights and Small Business Utilization Staff (CR&SBUS)" <u>has two full-time program specialists</u> working to resolve program complaints. These program specialists are supplemented by an administrative assistant who provides secretarial support and two staff assistants who maintain case files and the tracking system. The two program specialists and the <u>two staff</u> assistants transferred to FSA from the civil rights staff of the former Farmer's Home

Administration (FmHA) during the Department's reorganization in October 1995.  <u>The staff assistants have been performing analyses of the preliminary inquiries conducted on the complaints, although they are not trained or otherwise qualified to do so.</u>  None of the former FmHA employees with CR&SBUS have position descriptions to reflect their current duties and responsibilities, and none have received performance appraisals for fiscal year 1996.

OIG Report, p.6 (emphasis added).

37.    OIG found a "massive backlog" of unprocessed FSA complaints. (OIG Report, p.6).

OIG found the FSA files "disorganized" and unaccountable:

…CR&SBUS was unable to provide us with an accurate number of outstanding complaints or their status.  We reviewed the case files and found them <u>generally disorganized.</u>  It was difficult for us to readily <u>determine the date of the complaint, the reason it was brought, and the status of its resolution.</u>

OIG Report, p.7 (emphasis added).

38.    OIG found hundreds of FSA cases unresolved:

Our review at the CR&SBUS and CREA disclosed that, between them, they had listed a total of 272 cases as being active.  <u>The oldest case listed dates back to 1986.</u> *** After resolving all duplications and determining the actual status of the 272 cases, we found that FSA had 241 cases of program discrimination complaints that had <u>not been resolved.</u>

OIG Report, p.7 (emphasis added).

39.    OIG found repeated unaccountability and missing files:

During our reconciliation of the two agencies' lists, we noted that some cases were listed by one or the other agency but could not be found in its filing system.  CR&SBUS listed 32 cases that we could not find in its filing system, and CREA listed 28 cases that we could not find in its filing system.  WE also noted that CR&SBUS listed cases unknown to CREA.  CR&SBUS listed 19 cases that CREA did not list."

OIG Report, p.7.

40.     OIG found there was no reliable method to the processing:

> CREA had officially closed 30 of the 272 cases with findings of no discrimination.  CREA had also closed one case with a finding of discrimination, and the complainant was compensated.  The case involved the FSA disaster program, and the complainant received which were at first denied by FSA.  Four of the remaining 24 cases had findings of discrimination as determined by CREA and are pending resolution.  On of the four complainants has not responded to the Department's written notice regarding filing a claim for compensation.  Offices of Operations officials are negotiating a settlement with the remaining three complainants.

OIG Report, pp. 7-8.

41.     OIG found improperly closed files and improper reviews, and many files with no

documentation.

> We found that FSA improperly closed and forwarded 30 complaints to program managers, without notifying the Department (26 of 30 cases were closed under the old FmHA agency management).  The civil rights staff concluded without first receiving concurrence from the Department that these cases were the result of "programmatic discrepancies" (i.e., agency error rather than civil rights violations).  Without departmental concurrence with its findings, the agency may not have addressed the legitimate cases of discrimination.  CREA has the responsibility to make final determination of program discrimination.  FSA may recommend to CREA that cases be closed, but it does not have the authority to close these cases without concurrence from CREA.  For example, we noted that in one instance FSA (the former FmHA) incorrectly concluded that a case had only programmatic concerns and closed the case without forwarding it to the Department.  Only after a civil rights staff member complained, did FSA process the case as a civil rights discrimination case.  The civil rights staff stated in a letter that the allegation of racial discrimination was overlooked.  The mix-up was discussed with the Department, which determined that the case should be process by the civil rights staff.  For most of the <u>remaining cases, we found no Department has reviewed these cases</u>.

OIG Report, p.8 (emphasis added).

42.    OIG found 58% of the FSA civil rights complaint case files were over 1 year old and over 150 cases were almost two years old:

> . . . the average age of the 241 cases we consider open because they were not officially closed by the Department.

| No. of Cases | Program | Average Age |
|---|---|---|
| 151 | Ag. Credit (Farm Loans) | 703 Days |
| 40 | Disaster | 485 Days |
| 50 | Others | 482 Days |

> of the 241 open cases, 139 (58 percent) were known to be over 1 year old.  Of the 241 cases, 129 (54 percent) are awaiting action in FSA; the remaining 112 cases, 46 percent) are in the hands of the CREA staff in USDA's Office of Operations.  Sixty-five of the cases at FSA (50 percent) need a preliminary inquiry.  Some of these date back to 1993.

OIG Report, p.8.

43.    OIG found no system within FSA for reconciliation or tracking of civil rights complaint cases:

> CR&SBUS has no procedures in place to reconcile or track the status of complaints after they are forwarded to CREA.  Therefore, CR&SBUS could not tell us the status of complaints at CREA.  As noted above, both CR&SBUS and CREA had different numbers and were not aware of all the outstanding complaints.

OIG Report, p.8 (emphasis added).

44.    OIG found no management oversight within FSA with respect to the handling of civil rights complaints:

> CR&SBUS also does not prepare management reports to inform FSA program managers of alleged problems of discrimination within their programs.  Without this information, program managers may not be aware of potential discrimination in the programs they are responsible for administering.

OIG Report, p.9.

45.     With respect to DEFENDANTS' Office of Operations, Civil Rights Enforcement and

Adjudication (CREA), OIG found repeated inaccuracies and unaccountability:

> . . .that the listing of outstanding cases provided by CREA contained inaccurate information.  In some instances we were unable to locate the case files at CREA that were on its outstanding case list.  Without reviewing the case files, were unable to verify the status of the complaints.  Also, CREA and FSA had not reconciled their cases, and neither could inform us of the correct number of outstanding cases.
>
> CREA does not have controls in place to monitor and track discrimination complaints.  When complaints are received they are logged in, given a case number, and after the agency forwards the preliminary inquiry to CREA, the case is assigned to one of its seven program specialists to follow up on overdue responses from the agency.  We have found that CREA is not following up on discrimination cases it returned to FSA for conciliation or performance of a preliminary inquiry.  CREA advises the agency that it has 90 days to complete its review, but it does not follow up with the agency to determine the status of the complaint.

OIG Report, p.9.

46.     OIG surveyed 10 other USDA program agencies in addition to FSA, to determine the

procedures used for processing program discrimination complaints and found the same problems.

[OIG Report, pp. 10-11]

47.     OIG compiled a list of outstanding ("open") program discrimination complaints, as

late as 1996, within the Department, totaling 271. [OIG Report, at Attachment A]

48.     At the same time that OIG released its report, a USDA Civil Rights Action Team

released a report, dated February 1997, condemning DEFENDANTS' lack of civil rights

enforcement and lack of accountability which, inter alia, were a cause of the drastic decline in the

number of African American farmers.  (The Report is hereinafter referred to as "CRAT"):

> According to the most recent Census of Agriculture, the number of all minority farms has fallen –from 950,000 in 1920 to around 60,000 in 1992.  For African Americans, the number fell from 925,000, 14 percent of all farms in 1920, to only 18,000, 1 percent of all farms in 1920.

[CRAT, p.14].

49.     CRAT found a common problem involved minority farmers applying to

DEFENDANTS loans:

> The minority or limited-resource farmer tries to apply for a farm operating loan through the FSA county office well in advance of planting season.  The FSA county office might claim to have no applications available and ask the farmer to return later.  Upon returning, the farmer might receive an application without any assistance in completing it, then is asked repeatedly to correct mistakes or complete oversight in the loan application.  Often these requests for correcting the application could be stretched for months, since they would come if the minority farmer contacted the office to check on the loan processing.  By the time processing is completed, even when the loan is approved, planting season has already passed, and the farmer either has not been able to plant at all, or has obtained limited credit on the strength of an expected FSA loan to plant a small crop, usually without the fertilizer and other supplies necessary for the best yields.  The farmer's profit is then reduced.

[CRAT, p.15 (emphasis added)]

50.     CRAT found systematic mistreatment of minority farmers:

> If the farmer's promised FSA loan finally does arrive, it may have been arbitrarily reduced, leaving the farmer without enough money to repay suppliers and any mortgage or equipment debts.  In some cases, the FSA loan never arrives, again leaving the farmer without any means to repay debts.  Further operating and disaster loans may be denied because of the farmer's debt load, making it impossible for the farmer to earn any money from the farm.  As an alternative, the local FSA official might offer the farmer an opportunity to lease back the land with an option to buy it back later.  The appraised value of the land is set very high, presumably to

support the needed operating loans, but also making repurchase of the land beyond the limited-resource farmer's means.  <u>The land is lost finally and sold at auction,</u> where it is bought by someone else at half the price being asked of the minority farmer.  Often, it is alleged that the person was a friend or relative of one of the FSA county officials.

[CRAT, p.16 (emphasis added)]

51.     CRAT found insufficient oversight of farm credit to minorities:

Currently, the Farm and Foreign Agricultural Services (FFAS) Mission Area, which manages the FSA program delivery system, provides <u>ineffective oversight of the local delivery of farm credit services</u>.

[CRAT, p.16 (emphasis added)]

52.     CRAT found a lack of diversity in FSA program delivery structure:

Because of the ways in which State and county committees are chosen and county offices are staffed, <u>FSA lacks diversity in its program delivery structure.</u>    Federal EEO and Affirmative Employment laws and policies do not govern the FSA non-Federal workforce except by agency regulation.

[CRAT, p.18 (emphasis added)]

53.     CRAT found a lack of minority employees in  FSA county offices: "A recent GAO study indicated that in the 101 counties with the largest concentration of minority farmers, one-quarter had no minority employees in their offices." [CRAT, p. 18].

54.     CRAT found lower participation rates and lower approval rates for minorities in  FSA programs:

Recent studies requested by Congress and FSA have found <u>lower participation  </u> and <u>lower loan approval rates for minorities inmost FSA programs</u>.  Participation rates in 1994 in programs of the former Agricultural Stabilization and Conservation Service (ASCS),

particularly commodity programs and disaster programs, were disproportionately low for all minorities. The GAO found that between October 1, 1994 and March 31, 1996, 33 percent of minority applications but only 27 percent of non-minority application in the Agricultural Conservation Program (ACP) were disapproved. During the same period, 16 percent of minority but only 10 percent of non-minority loans in the direct loan program were disapproved.

[CRAT, p.21 (emphasis added)]

55. For some states, the approval rates for farm loans were widely disparate:

For example, only 67 percent of African-American loans were approved in Louisiana, compared to 83 percent of non-minority loans. Alabama showed a similar disparity --only 78 percent of African-American l0ans approved compared to 90 percent of non-minority loans.

[CRAT, p.21 (emphasis added)]

56. CRAT found minorities endured longer loan processing times:

Again, however, some States showed consistently longer processing times for minorities. In the Southeast, for example, in several States it took three times as long on average to process African-American loan applications as it did non-minority applications. Similar disparities between non-minority loan processing and American Indian loan processing appeared in records for a number of States included in FSA's Northwest region.

[CRAT, p.21].

57. CRAT found discrimination complaints at USDA were often ignored:

Farmers who told the CRAT stories of discrimination and abuse by USDA agencies also described a complaints processing system which, if anything, often makes matters worse. They described a bureaucratic nightmare where, even after they receive a finding of discrimination, USDA refuses to pay damages. They charged USDA with forcing them into court to seek justice, rather than working with them to redress acknowledged grievances. They painfully described the toll these ongoing battles with USDA have taken on their families, and on their health.

[CRAT, p. 22-23].

58.     CRAT found decisions favoring farmers routinely not enforced by USDA: "However, many farmers, especially small farmers, who have managed to appeal their cases to FSA charge that even when decisions are overturned, local offices often do not honor the decision.  They claim that decisions favoring farmers are simply "not enforced".

59.     CRAT found a lack of USDA regulations for discrimination complaint processing:

> Program discrimination complaints generally fall within two categories: (1) programs conducted directly by a USDA agency, such as USDA loan programs, and (2) federal assisted programs, where USDA does not directly offer services to customers, but recipients of USDA funds do.  The recipients must obey civil rights laws, and USDA can be sued under such laws as Title VI, the Rehabilitation Act, IX, the Equal Credit Opportunity Act, and others.   CRAT members were informed by OGC that USDA presently  has no published regulations with clear guidance on the process or time lines involved in program discrimination complaints. When a farmer does allege discrimination, "preliminary investigations" are typically conducted by the agency that has been charged with violating her or his right.

[CRAT, p.24].

60.     CRAT found discrimination complaints often are not responded to by USDA: ". . . USDA doesn't respond even when they do file complaints.  In Tulsa, OK. , an advocate representing black and American Indian farmers said, "we have filed 72 civil rights complaints.  Not one complaint has even been answered." [CRAT, p.24]

61.     CRAT found record-keeping on discrimination complaints "non-existent" and that a backlog existed:

> The CRAT was unable to gather historical data on program discrimination complaints at USDA because <u>record keeping on these matters has been virtually nonexistent.</u>  Complaints filed with the agencies are not necessarily reported to USDA's Civil Rights office.  Some figures are available however, for cases that were

open as of December 31, 1996.  The largest number of pending discrimination complaints, as comments at the listening sessions suggests, are concentrated in three agencies at USDA.  There were 205 cases pending, representing 42 percent of the total, against the FSS; 165, or 33.3 percent against the Rural Housing Service (RHS); and 62, or 12.5 percent against the Food and Consumer Services.  Sixty-three cases, or 12.7 percent of the total, were pending against other agencies.  The Department had a total of 495 pending program discrimination complaints.  Approximately one-half of the  pending cases are two years old or older, verifying farmer's contention that  complaints are being processed slowly, if at all.  According to the Complaints Processing Division at the Office of Operation (OO), which processes complaints that make it to the Department level?  USDA averages about 200 new program discrimination complaints each year.  However, in fiscal year 1996, an average of only 9 cases was closed per month, or 108 during the year – increasing a backlog of program complaints.

[CRAT, pp. 24-25 (emphasis added)]

62.    CRAT uncovered neglect of and bias against minorities by USDA, resulting in a loss of farmers' land and income.

The recent Civil Rights listening session revealed a general perception of apathy, neglect, and a negative bias towards all minorities on the part of most local USDA government officials directly involved in decision making for program delivery.  A reporter at the recent listening session in Tulsa, Oklahoma observed that minority farmers are not sure which condition "was worse – being ignored by the USDA and missing potential opportunities or getting involved with its programs and facing a litany of abuses. Minority farmers have lost significant amounts of land and potential farm income as a result discrimination of FSA programs and the programs of its predecessor agencies, ASCS and FmHA.  Socially disadvantaged and minority farmers said USDA is part of a conspiracy to take their land and look to USDA for some kind of compensation for their losses.

[CRAT, p. 30].

63.    CRAT found USDA the fifth worst (of 56 government agencies) in  hiring minorities:

According to the US Department of Labor, between 1990 and 2000, women, minorities, and immigrants will account for 80 percent of the United States labor force growth.  The "Framework for Change: Work Force Diversity and Delivery of Programs," a USDA

report released in 1990, found that USDA had a need to remedy under-representation in its workforce by providing equal employment and promotion opportunities for all employees.  When this statement was made, USDA ranked 52 out of 56 Federal agencies in the employment of minorities, women, and individuals with disabilities.

[CRAT, p.33].

64.     CRAT found the lack of diversity at USDA adversely affects program delivery to minorities:     "USDA's workforce does not reflect the diversity of its customer base.  The lack of diversity in field offices adversely affects program delivery to minority and women customers of USDA." [CRAT, p.45]

65.     CRAT found a lack of resources at USDA to ensure fair and equitable (non-discriminatory ) program delivery to farmers:

> The Assistant Secretary for Administration is USDA's senior official responsible for civil rights.  Although that position has the responsibility for civil rights policy and compliances, it does not have the authority or resources necessary to ensure that programs are delivered and employees are treated fairly and equitably.

[CRAT, p.46].

66.     CRAT found enforcement of civil rights at USDA in program delivery lacking:

> Another problem with enforcing civil rights in program delivery is fragmentation.  Agency civil rights directors have a number of responsibilities.  For example, USDA agencies each perform come complaint processing functions.  However, the Commission noted that the respective roles of OCRE and the agencies were not clearly defined.  The Commission also found that OCRE was providing technical assistance to agencies on civil rights statutes, not proactively, but only when requested.

[CRAT, p.51]

67.     CRAT found a lack of civil rights specialists and knowledge for program-related civil

rights issues at USDA:

> The Civil Rights Commission's report on the lack of Title VI enforcement also pointed to USDA's lack of civil rights specialists in program-related civil rights issues.  Many of the Department's civil rights resources are devoted to processing of employment discrimination complaints.  Of the current staff in the Department's two civil rights offices, two-thirds work on EEO complaints.  That means only a small percentage of USDA's civil rights staff works on civil rights issues relating to program delivery.  According to the Commission, the 1994 civil rights reorganization was deficient because OCRE did not separate internal and external civil rights issues into separate offices.  The Commission predicted that "a probable consequence is that USDA's Title VI enforcement program may suffer as OCRE responds to pressures to improve USDA's internal civil rights program."  It recommended that USDA establish "two separate units, with different supervisory staff," one for internal and one for external civil rights issues.

[CRAT, p.54]

> 68.    CRAT found DEFENDANTS' counsel hostile to civil rights, if not racist:

> The perception that the Office of the General Counsel [at USDA] is hostile to civil rights has been discussed earlier in this report.  OGC's legal positions on civil rights issues are perceived as insensitive at the least, and racist at worst.  Correcting this problem is critical to the success of USDA's civil rights program.

[CRAT, p.55]

> 69.    CRAT  found DEFENDANTS' counsel often have no civil rights experience or

education:

> However, the CRAT has found that attorneys who practice civil rights law at [USDA's] OGC are not required to have specialized experience or education in civil rights when they are hired.  They acquire their civil rights experience on the job.  In addition, most of OGC's lawyers working on civil rights issues work on non-civil rights issues as well.

[CRAT, p.55]

70.     In sum, CRAT concluded that DEFENDANTS does not support or enforce civil rights:

> USDA does not have the structure in place to support an effective civil rights program. The Assistant Secretary for Administration lacks authority and resources essential to ensure accountability among senior management ranks. There has been instability and lack of skilled leadership at the position of USDA Director of Civil Rights. Dividing up the Department's Civil Rights office between policy and complaints has further exacerbated the problem. The division of responsibility for civil rights among different USDA offices and agencies has left confusion over enforcement responsibilities. Finally, OGC is perceived as unsupportive of civil rights.

[CRAT, p. 56]

71.     On September 29, 1997, USDA's Office of Inspector General issued Phase II of the OIG Report on Civil Rights Issues, entitled "Minority Participation In Farm Service Agency's Farm Loan Programs – Phase II" (hereafter "OIG Report Phase II") which found, inter alia that (a) DEFENDANTS has resolved only 32 of the 241 outstanding discrimination complaints reported in the OIG Report (back in February, 1997) and (b) that the backlog of discrimination complaints had increased from 241 to 474 for FSA and from 530 to 984 for all of USDA.

72.     On September 30, 1998, the USDA's Office of Inspector General released its "Report to the Secretary on Civil Rights Issues – Phase V" [hereinafter "OIG Report V"], which supplements PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS claims and supporting materials in this lawsuit and in the above pending motions. In particular, OIG Report V states, inter alia:

> i.      "We found that the Department [USDA], t through CR (Office of Civil Rights], has not made significant progress in reducing the complaints backlog. Whereas the backlog stood at 1,088 complaints on November 1, 1997, it still remains at

616 complaints as of September 11, 1998." OIG Report V, cover letter to the Secretary.

ii.     The backlog is not being resolved at a faster rate because CR itself has not attained the efficiency it needs to systematically reduce the caseload. Few of the deficiencies we noted in our previous reviews have been corrected. <u>The office is still in disarray, providing no decisive leadership and making little attempt to correct the mistakes of the past.</u> We noted with considerable concern that after 20 months,  CR has made virtually no progress implementing the corrective actions we thought essential to the viability of its operations. OIG Report V at I (emphasis added).

iii.    Most conspicuous among the uncorrected problems is the <u>continuing disorder within CR.</u> The database CR uses to report the status of cases is <u>unreliable and full of error,</u> and the files it keeps to store needed documentation are <u>slovenly and unmanaged.</u> Forty complaint <u>files could not be found,</u> and another 130 complaints that were listed in USDA agency files were not recorded in  CR's data base. <u>Management controls were so poor</u> that we could not render an opinion on the quality of CR's investigations and adjudications." OIG Report V at iii (emphasis added).

iv.     "Of equal significance is the absence of written policy and procedures." OIG Report V at iii.

v.      "The absence of formal procedures and accurate records raises questions about due care within the complaints resolution process. <u>We found critical quality control steps missing at every stage of the process.</u> Staff members with little training and less experience were put to judging matters that carry serious legal and moral implications. <u>Many of CR's adjudicators, who must determine whether discrimination occurred, were student interns.</u> Legal staff members with the Office of  General Counsel (PGC), who review CR's decisions for legal sufficiency,  have had to return over half of them because they were based on incomplete data or faulty analysis.  We noted that a disproportionately large percent of the 616 cases of unresolved backlog had bottlenecked in the adjudication unit." OIG Report V at iii (emphasis added).

73.     In sum, DEFENDANTS' willful disregard of, and failure to properly investigate, African-American discrimination complaints began with the disbanding of civil rights enforcement functions back in 1983, until February 1997 when the current administration reorganized and reestablished the enforcement staff of the civil rights office, and since February, 1987, has gotten worse, as evidenced by the massive increase of backlogged, unresolved cases and overall disarray in the USDA Office of Civil Rights as reported in the most recent OIG Report.

## B.     THE PIGFORD DISASTER RELEVANT TO BFAA, INC. CLASS

74.     The Pigford lawsuit is "a disaster," opined Mr. Vernon Parker, Assistant Secretary for Civil Rights.  Richmond Times Dispatch.

75.     In the Pigford lawsuit Memorandum and Order approving the Consent Decree, the Court opined regarding the Consent Decree's flaws and weaknesses by asserting that the agreement was "moot on forward looking injunctive relief" and the restructuring of the antiquated county committee system that led to the gross deprivation of rights and discrimination against the Pigford class members.            .

76.     The Environmental Working Group, a public interest group which studies US Agriculture policy, released a report,  *Obstruction of Justice: USDA Undermines Historic Civil Rights Settlement for Black Farmers",July 26, 2004,* essentially concluding that the Pigford lawsuit has been rendered an abject failure. The EWG in describing the Pigford failures stated as follows:

> A.     Deadline barred 64,000 claims, despite lack of notice. The
>          settlement-funded arbitrator rejected 64,000 farmers who
>          came forward with claims during the late claims process

established by the court. The late claims process was necessary because the farmers' attorneys, whose representation was characterized by the court as "bordering on legal malpractice," failed to notify the farmers of the original deadline for application. The settlement-funded arbitrator rejected these 64,000 farmers simply on the basis of their tardiness for the original deadline, even though all 64,000 rejected claims were submitted within the court established late claims period. An additional 7,800 farmers failed to file before the late claims deadline expired and were also denied entry to the class.

B.   Nearly nine out of ten denied restitution. USDA aggressively fought claims by African American farmers, contracting with United States Department of Justice lawyers who spent at least 56,000 staff hours and $12 million contesting individual farmer claims for discrimination.

77.   The Black Farmers' saga and the Pigford's "disaster" have been chronicled in news coverage, print and electronic, all over the country since the release of the EWG Report. In fact, the editorials demanding justice for black farmers abound, to wit:

From EWG's report "*Obstruction of Justice*"

| | | |
|---|---|---|
| **8/30/2004** | **Richmond Times-Dispatch** | |
| | *John Boyd: Farmers Remain Stubborn in Seeking Restitution* | |
| **8/10/2004** | **Philadelphia Inquirer** | |
| | *Agricultural Racism* | |
| **8/10/2004** | **Pittsburgh Post-Gazette** | |
| | *Fairness drought black farmers still seek justice after win in court* | |
| **8/9/2004** | **Detroit Free Press** | |
| | *Black Farmers: Agriculture Dept. has delayed payments far too long* | |
| **8/4/2004** | **Toledo Blade** | |
| | *Compensate black farmers* | |
| **8/1/2004** | **The Washington Post** | |

*Adjusting Justice*

| | | |
|---|---|---|
| 7/30/2004 | **St. Petersburg Times** | |
| | *The USDA's discrimination* | |
| | | |
| 7/28/2004 | **International Herald Tribune** | |
| | *Remedy for black farmers* | |
| | | |
| 7/27/2004 | **Palm Beach Post** | |
| | *This crop still isn't in* | |
| | | |
| 7/27/2004 | **The News & Observer** | |
| | *Bitter fruit* | |
| | | |
| 7/27/2004 | **The New York Times** | |
| | *Restitution for Black Farmers* | |
| | | |
| 7/26/2004 | **Akron Beacon Journal** | |
| | *Bitter harvest* | |
| | | |
| 7/24/2004 | **The Commercial Appeal** | |
| | *Black Farmer Bias Case Still Unresolved* | |


# VIII.
## THE CURRENT CONDITION
## NO JUSTICE FOR BLACK FARMERS
## POST PIGFORD FILING AND CONSENT DECREE
### (JANUARY 1, 1997 THRU AUGUST 31, 2004 and continuing)


**A.    HOW PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS AND MEMBERS OF THE BFAA, INC. CLASS WERE DAMAGED; WHAT DEFENDANTS DID IN RESPONSE TO COMPLAINTS OF DISCRIMINATION AND GOVERNMENT REPORTS OF INEFFICIENCY**

78.    Unbeknownst to BFAA, Inc., prospective class representatives and putative class members and despite the 1977 *Pigford* law suit and the resulting 1999 Consent Decree, the Defendants continued discriminating, in violation of the FOURTEENTH AMENDMENT, ECOA and the APA, against the proposed class members, individually and collectively, and operating OCREA in a manner, *if not de jure, but indisputably de facto*, closely consistent with the goals of

---

the Reagan Administration in shutting down the OCREA (Office of Civil Rights ["OCR"] ) in 1983.

79.     In 1996, and after years of abuse and complaints, the OIG initiated a series of civil rights compliance, employee and programmatic investigations4, some of which are above delineated. Subsequent to Pigford, the OIG continued its annual investigations up to and including the year 2000 at which time the OIG investigations and reports abruptly ceased.5

80.     On information and belief, the Bush Administration, by and through DEFENDANTS, individually and collectively, directed and or caused OCR, during and subsequent to the *Pigford* lawsuit and the resulting Consent Decree, to delay and frustrate program and employee discrimination investigations and to not issue affirmative findings of discrimination pursuant to 7 CFR §§ 2.28, 15.52, et. seq. and related Secretarial Delegations of Authority to the Assistant Secretary for Administration, the Assistant Secretary for Civil Rights and the OCR Director.

81.     The USDA's discrimination saga against black and minority farmers continues as official reports after official reports delineate the extent and depth of the discrimination against the class and the DEFENDANTS efforts to deprive the class members of their civil rights, to wit:

(a.)     *U.S. Commission on Civil Rights, Office of Civil Rights Evaluation, Ten-Year Check-up: Have Federal Agencies Responded to Civil Rights Recommendations?, Volume lll: An Evaluation of the Departments Of Agriculture. . .,*

---

4 The Office of Civil Rights employee and program administrative investigative processes are under the auspices of the Assistant Secretary for Civil Rights Vernon Parker, a Defendant herein.   There is no distinction in terms of policy or personnel relative to employee and program complaints.  Defendants would argue contrary to this position. Succinctly put, their argument presents a distinction without a difference.

5 On information and belief, the USDA OIG initiated two new discrimination review reports, entitled, Evaluation of the Office of Civil Rights' Efforts to Implement at Implementation of recommendations in seven previous OIG Investigations.  The OIG commented that it would be "some time" before the new reports would be completed and released.

---

*Statutory Report for Commissioner's Review,* June 12, 2003;

(b.) *U.S. Department of Agriculture: Problems in Processing Discrimination Complaints, General Accounting Office ("GAO"),* GAO/T-RCED-00-286,-January,1999;

(c.) *United States Department of Agriculture, Report to the Secretary 0f Agriculture On Civil Rights Issues – Phase IV: Evaluation of the Office of Civil Rights' Efforts to Implement Civil Rights Settlements, Office of Inspector General,* Evaluation Report No. 60801-2-Hq, March 1999;

(d.) *U. S. Department of Agriculture, Office of Inspector General Audit Report, Office of Civil Rights Management of Employment Complaints,* USDA/OIG/A6-60801-3-Hq,-March,2000;

(e.) *U.S. Department of Agriculture, Office of Inspector General Audit Report, Office of Civil Rights Status of the Implementation of Recommendations Made in Prior Evaluations of Program Complaints,* USDA/OIG/A7-60801-4-Hq,-March,2000;

(f.) *U. S. Equal Employment Opportunity Commission, Office of Federal Regulations, February 26,  2003 Report.* (*The Hadden Report), EEOC Onsite Report, USDA02,* and

(g.) *U.S. Equal Employment Opportunity Commission, Office of Federal Operations Report, Annual Report on the Federal Workforce Fiscal Year 2003, Profiles of Selected Indicators, U.S. Department of Agriculture (USDA).*

82.    United States Civil Rights Commission ("USCCR") 2003 Report, chronicles the USDA's continuous, intentional, insidious institutional racism, and its benign neglect of this country's civil rights laws and this county's efforts to rid this society of such mindless racial animus and hatred.  The report states, in part, as follows:

---

<u>Department of Agriculture</u>

The Department of Agriculture (USDA) administers billions of dollars in federally assisted programs that reach almost every citizen in the United States. Civil rights offices and staff are situated throughout the Department… The Department has one of the most complex and decentralized civil rights structures in the federal government. USDA has done little to coordinate all of its civil rights responsibilities effectively. The Department's agencies have undergone reorganizations, name changes, and realignments; however with inconsistent result. Overall, the Department has not made significant changes to address the Commission's 1996 recommendations or improve civil rights enforcement.

U.S. Commission on Civil Rights, Office of Civil Rights Evaluation, Ten-Year Check-up: Have Federal Agencies Responded to Civil Rights Recommendations?, Volume lll: An Evaluation of the Departments Of Agriculture. . . Statutory Report for Commissioner's Review, June 12, 2003, p. vii.; same being incorporated herein as if fully set forth verbatim.

83. In its evaluation of the USDA's Civil Rights Programs, The USCCR concludes, in part, as follows:

. . . USDA/OCR could not distinguish its Title VI (**Title VII or ECOA**) workload or expenditures from those of the activities that other civil rights statues required. OCR could not plan reasonable goals for Title VI (**Title VII or ECOA**) enforcement. . . In addition OCR's guidance is still confusing. . .**USDA/OCR**, FSA had not made many improvements or changes since the Commission evaluated what was the FmHA (FSA) in 1996. . . FSA/OCR does not have the ability to submit and control its own budget. . .In 1996, the agency submitted Civil Rights Implementation Plans to DOJ, but today the agency is not required to submit plans because it conducts few if any pre-award and post-award reviews and has no record of legal and administrative activity. . . **despite its legal, administrative and regulatory authority and mandate to so do**.

Id. at 34, 52 (emphasis added).

84. The GAO has been just as critical of the USDA's civil rights programs and refusal to adequately provide due process and equal protection to program participants, prospective class

members, and employees as has other internal and external federal agencies.  The GAO stated:

> Pursuant to a congressional request, GAO discussed the Department of Agriculture's (USDA) efforts to process discrimination complaints, focusing on the:
>
> (1)    timeliness and ability of USDA's Office of Civil Rights (OCR) to process employment discrimination complaints; and
>
> (2)    reasons for delays in the implementing GAO's previous recommendations.
>
> GAO noted that:
>
> (1)    a number of long-standing problems are impending USDA's efforts to improve delays in its processing of discrimination complaints within its Civil Rights Program, including:
>
> > (a) continuing management turnover and reorganizations in USDA's OCR;
> >
> > (b)    inadequate staff and managerial expertise;
> >
> > (c)    a lack of clear, up-to-date guidance and procedures; and
> >
> > (d)    poor working relationships and communication within OCR and between the office and other USDA entities;
>
> (2)    USDA is not consistently using alternative dispute resolution techniques, such as mediation, to address workplace and other disputes before they become formal complaints;
>
> (3)    USDA has drafted a long-term improvement plan to systematically address problems in the program which they plan to implement in October 2000;
>
> (4)    to address personnel problems in OCR, USDA plans to: develop an (a) assessment of the skills needed for OCR; (b) implement training programs to properly educate employees; and (c) to conduct performance evaluations that would provide the basis for taking appropriate action in regard to employees who are not performing at acceptable levels;
>
> (5)    OCR is in the process of issuing two operations manuals and several standard operating procedures for implementing regulations addressing complaint processing;
>
> (6)    OCR's implementation of the program complaint process was hindered by agencies' disagreement with OCR about their role in the program complaint process and by inadequate OCR guidance;

    (7)      OCR also has difficulties in developing effective working relationships with the Office of General Counsel, which further lead to inefficiencies and delays in processing complaints;

    (8)      inadequate communication within OCR also contributed to low morale and productivity;

    (9)      according to USDA's Assistant Secretary for Administration, OCR meets regularly with a committee of agency civil rights directors;

    (10)    GAO's 1999 report on this matter found that USDA's Civil Rights Program had a long way to go before it achieved the Secretary's stated goal of making USDA the civil rights leader in the federal government;

    (11)    plans to address civil rights complaints will require long-term implementation, including funding for hiring and training personnel; and

    (12)    <u>it appears as if the Secretary's goal, at least in the short term, remains elusive.</u>

U.S. Department of Agriculture: Problems in Processing Discrimination Complaints (Testimony, 09/12/2000, GAO/T-RCED-00-286).

85.    In reporting to the Secretary on the implementation of program administrative settlement agreements resulting from USDA's admitted discrimination and USDA's refusal to discipline the offending government officials, Inspector General Roger C. Viadero wrote the following:

    . . . Even though there was a high probability that discrimination did indeed occur. . . no disciplinary action has been taken against any discriminating official.  CR (Office of Civil Rights, OCR) has provided agencies no formal guidance on how to proceed. . . We have consistently urged CR to provide guidance on all stages of the complaint resolution process. . . CR remained unaware of the number and status of all agreements. CR was not tracking the implementation of the agreements, and it offered no formal guidance on cases that had been referred for disciplinary action. <u>We found that no disciplinary actions had been taken in any of the cases involving proven or probable discrimination . . .</u>

United States Department of Agriculture, Report to the Secretary 0f Agriculture On Civil Rights

Issues – Phase IV: Evaluation of the Office of Civil Rights' Efforts to Implement Civil Rights

Settlements, Office of Inspector General, Evaluation Report No. 60801-2-Hq, March 1999;  pp. 2, i

(Executive Summary)

86.     In his Phase VII Report to the Secretary on Civil Rights Issues, USDA Inspector

General Roger V. Viadero wrote:

> . . . Although this is the first time we evaluated CR's management of
> EEO              complaints, it represents our *seventh* attempt to
> provide CR with constructive ways to overcome its inefficiencies.
> Based on our current review of CR's EEO complaint processing and
> our observations of the EEO operating environment at CR, we cannot
> report encouraging news . . . **CR is as inefficient in processing EEO**
> **complaints as past reviews have shown it to be in processing**
> **program complaints** (*Complaints of Class Members*). . . Based on
> the deficiencies we found in the EEO complaints resolution process
> and CR's poor record of responding to our past recommendations
> concerning complaint processing, it is doubtful that any significant
> level of progress will occur in the EEO (*and program*) complaint
> processing.

U. S. Department of Agriculture, Office of Inspector General Audit Report, Office of Civil Rights

Management of Employment Complaints, USDA/OIG/A8-60801-3-Hq,-March,2000;  pp 1-2

(emphasis added).

87.     The Inspector General further concluded, among other detailed conclusions, that (a)

the OCR case files "were in chaos"  (b) "case files were not maintained with any decree of order, (c)

"documents were either improperly filed or missing, and (d) files themselves were disordered and

sometimes difficult to locate."

88.     To illustrate the callous disregard for the rights of all complainants by the

Defendants, the Inspector General included the following visuals in his report:

---

8 On information and belief, the USDA OIG initiated two new discrimination review reports, entitled



Figure 2.  CR's File Room, Showing Files Stacked in Borrowed Shopping Cart.



Figure 3.  CR's File Room, Showing Boxed Files

USDA/OIG/A 60801-3-Hq                                          Page 10



**Figure 4. CR's File Room, Showing Unfiled Casefiles.**

During our inventory, we also discovered that not all casefiles were maintained in a secure area. Some casefiles we inventoried were left unsecured in employees' cubicles when they were absent. Several more casefiles relating to complaints that were awaiting a signature from the director were shelved out in the open and not subject to ECD's normal file room checkout procedures.

Because of the condition of CR's file room and its casefiles, we cannot be certain that we have been apprised of all of CR's complaints or their status in the complaints resolution process. Our best guess, based on our physical inventory, is that CR maintained a caseload, as of September 7, 1999, of 1,731 open cases.

### Reconciliation of Casefiles Inventoried by OIG

| | | |
|---|---|---|
| Total Casefiles inventoried by OIG | | 2,129 |
| - Closed files (per casefile documentation) | 263 | |
| - Closed files (per EEOMAS) | 136 | |
| - Undetermined Status | 17 | 416 |
| Total Open Casefiles inventoried | | 1,713 |
| + Missing Open Casefiles (Open per EEOMAS. Unable to review.) | | 18 |
| Total Open Casefiles per OIG (See Table 6.) | | 1,731 |

**Table 7. Number of Casefiles Inventoried and Number Actually Open.**

### CR's Caseload Does Not Match USDA Agencies' Records

Each USDA agency maintains a list of all EEO complaints filed by its employees. In our attempt to validate CR's data base, we obtained a listing of open complaints from the

---

**USDA/OIG/A 60801-3-Hq**                                          **Page 11**

Id. at 10,11 (FN9).

89.     In yet another scathing report to the Secretary, of USDA's intentionally non-responsive and near dormant civil rights program and in the subtle furtherance of program discrimination resulting in denial of due process and equal protection of the laws and violation of the APA and ECOA, against this class, Inspector General Roger C. Viadero, wrote

>     (a)     . . . This is our seventh attempt to provide CR with constructive ways to   overcome its' inefficiencies. . . we cannot report encouraging news. . .  <u>We found that CR continues to be inefficient in processing program **(class member)** complaints.</u> Program complainants must wait, on average, 122 days before they are even notified by CR that it intends to investigate their complaints. <u>The processing time reported to you do not reflect the actual average times and do not provide meaningful comparisons on which to base the notion of progress;</u> and

>     (b)     . . . CR did not reengineer its complaints resolution process. Although CR officials had previously agreed that the system they used to process complaints was neither effective or efficient and although we recommended a major transformation of this system, **_<u>no significant changes in how complaints are processed has been made.</u>_**  As a result, we cannot conclude that all complaints are being <u>processed with due care. . .</u> CR's data base and file room remain poorly managed. . . <u>Given the condition of the program complaint files, we conclude that no document-by-document sweep of the files has occurred. Case files are still missing.</u>

U.S. Department of Agriculture, Office of Inspector General Audit Report, Office of Civil Rights Status of the Implementation of Recommendations Made in Prior Evaluations of Program Complaints, USDA/OIG/A10-60801-4-Hq,- March 2000 (emphasis added).

90.     The EEOC Hadden Report, dated February 26, 2003, issued numerous findings,

---

9 Counsel would not ordinarily include photographs in a Complaint.  However, the conduct complained of is so egregious and injurious to the prospective class members, Counsel believes the Court would appreciate such a demonstrative allegation.

10 On information and belief, the USDA OIG initiated two new discrimination review reports,

relative to the poor and deplorable performance of the OCR in complaint processing that irrefutably

substantiates the class members' allegations herein, as follow:

FINDING 1
The Defensive functions of the USDA's Office of General Counsel
intrude on the investigation and deliberation of EEO *(and program)*
complaints... representatives from the Office of General Counsel,
Civil Rights Division, intrude in the following areas of the EEO *(and*
*program)* complaint  process; (a) the investigation of formal EEO
complaints; and (b) the deliberations on EEO *(and program)*
complaints. <u>The intrusion of the *(USDA OGC)* Civil Rights Division
during the investigation of and deliberation on EEO complaints is
contrary to the spirit and language of MD-1 10</u>. . . Equal Employment
Opportunity Commission Management Directive for 29 C.F.R Part
1614 (MD-170), chapter 1, 1-2 pg (November 1999), <u>requires
agencies to have a complaint process where the neutral adjudication
function of the agency's EEO office *(OCR)* is kept separate from the
legal defense arm of the agency.</u> . .

FINDING 2
<u>The Office of General Counsel, Civil Rights Division's involvement
in the informal stage of the EEO *(and program)* process impedes the
opportunity for settlement.</u>

FINDING 7
The USDA's Office of Civil Rights does not complete EEO *(and*
*program)* Investigations within the regulatory time period. . .29
C.F.R. § 1614.108(e)(2). . . Our review disclosed that the EEO *(and*
*program)* investigative period is being delayed at two points: (a)
dismissing or accepting the complaint for investigation and (b)
reviewing the reports of investigation prior to release.

FINDING 8
The USDA's Office of Civil Rights, does not possess and effective
EEO *(and program)* complaint tracking system and process. . .the
process for ensuring data entered and produced is accurate and
complete is deficient. . . factors contributing to the deficiency: (a) the
EEO *(and program)* tracking system cannot produce all the necessary
data; (b) there is a lack of verification of the data entered; and (c)
status reports are not regularly provided the USDA subcomponents.

---

entitled

---

<u>CONCLUSIONS</u>
<u>Delays of EEO *(and program)* complaints, the absence of effective</u>
<u>oversight of EEO programs, and the lack of proper separation</u>
<u>between the Office of General Counsel and the Office of Civil</u>
<u>Rights, has severely impacted the integrity, efficiency, and</u>
<u>professionalism of the Office of Civil Rights, the programs it</u>
<u>administers, and its staff *(and has violated the rights of employees*</u>
*and USDA customers, class members herein).*

U. S. Equal Employment Opportunity Commission, Office of Federal Regulations, February 26,

2003 Report. (The Hadden Report), EEOC Onsite Report, USDA02, pp. 1-27 (emphasis added).

91.     The most recent report by the EEOC concluded that the "USDA took an average of

808 days to process a complaint from filing to closing. The average processing time for a merit

decision was 1,113 days." U.S. Equal Employment Opportunity Commission, Office of Federal

Operations Report, Annual Report on the Federal Workforce Fiscal Year 2003, Profiles of Selected

Indicators, U.S. Department of Agriculture (USDA).

# VIII.
# EQUAL CREDIT & OPPORTUNITY ACT

## A.   PURPOSE OF THE EQUAL CREDIT & OPPORTUNITY ACT

92.   The Equal Credit Opportunity Act ("ECOA"), as amended in 1976, is a detailed and

exhaustive legislative directive unequivocal in its statutory intent to stamp out discrimination by any

lender, anywhere, whether they be a private, public, governmental or quasi-governmental entity.

93.   ECOA states, inter alia :

> It shall be unlawful for any creditor to discriminate against any
> applicant, with respect to any aspect of a credit transaction – (1) on
> the basis of race, color, religion, national origin, sex or marital status,
> or age (provided the applicant has the capacity to contract);…

15 U.S.C. §1691 (a)(1). ECOA provides for monetary relief to both individuals and

class members who are damaged by creditors who violate the statute:

> Any creditor who fails to comply with any requirement imposed
> under this subchapter shall be liable to the aggrieved applicant for
> any actual damages sustained by such applicant acting either in an
> individual capacity or as a member of a class.

15 U.S.C. §1691e(a). Thirdly, district courts are invested with the authority to

provide equitable and declaratory relief:

> Upon application by an aggrieved applicant, the appropriate United
> States district court or any other court of competent jurisdiction may
> grant such equitable and declaratory relief as is necessary to enforce
> the requirements imposed under this subchapter.

15 U.S.C. §1691e(c) (emphasis added).  Fourthly, the prevailing party can recover

costs and reasonable attorney's fees:

> In the case of any successful action under subsection (a), (b), or (c) of
> this section, the cost of the action, together with a reasonable
> attorney's fee as determined by the court, shall be added to any
> damages awarded by the court under such subsection.

15 U.S.C. §1691e (d) (emphasis added).

94.     In sum, this court has jurisdiction to grant actual damages, equitable and declaratory relief, costs and attorneys fees, and ECOA contains a waiver of United States sovereign immunity.

95.     When the class members filed discrimination complaints, they fell four-square under the umbrella of ECOA.  It is PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS' belief that ninety-five percent of class members filed complaints of discrimination with respect to the USDA loan application process.  Only five percent have claims for denial of disaster applications.

96.     DEFENDANTS do not dispute the waiver of sovereign immunity under ECOA. Plaintiffs assert that there is no just reason for denying the remaining five percent of PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS' relief for complaints of discrimination involving disaster benefits.  While ECOA covers farm "credit" programs, but not disaster programs, the APA provides an avenue of relief for Black farmers who have been denied equal access to disaster programs and, subsequently, due process of law in challenging the implementation of that program.  The implementation of USDA's credit programs and other programs were closely intertwined and the violation of PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS' rights equally egregious in both areas.  Racial discrimination ran rampant under both programs, and neither offered Black farmers an opportunity to appeal to a civil rights enforcement body to obtain relief.  Further, in many instances, the calculation of loans under the credit program and payments or benefits under the other programs were interdependent.  For example, the amount of program benefits or program allotments that a farmer could receive for the crop of a commodity (such as cotton, corn, wheat, rice, peanuts, or tobacco) in a year required a review of his or her

farming history, which, in turn, was directly related to the yield per acre the farmer cultivated, which was dependent on the amount of operating credit made available to the farmer.

97.     Class members are seeking redress for the denial of due process to the members of the class for the discriminatory implementation of these interconnected farm programs and for the DEFENDANTS' failure regarding these programs to provide sufficient civil rights investigation and enforcement.

## B.     ECOA STATUTE OF LIMITATIONS IS WAIVED

98.     On October 21, 1998, the President signed into law the Omnibus Consolidated Appropriations Act for Fiscal Year 1999, P.L. 105-___.  This legislation contains the following provisions:

> Sec. 741.        Waiver of Statute of Limitations.
> a.     To the extent permitted by the Constitution, any civil action to obtain relief with respect to the discrimination alleged in an eligible complaint, if commenced not later than 2 years after the date of the enactment of this Act, shall not be barred by any statute of limitations.
>
> b.     The complainant may, in lieu of filing a civil action, seek a determination on the merits of the eligible complaint by the Department of Agriculture if such complaint was filed not later than 2 years after the date of enactment of this Act.  The Department of Agriculture shall–
>> i.     provide the complainant an opportunity for a hearing on the record before making that determination;
>> ii.     award the complainant such relief as would be afforded under the applicable statute from which the eligible complaint arose notwithstanding any statute of limitations; and
>> iii.     to the maximum extent practicable within 180 days after the date a determination of an eligible complaint is sought under this subsection conduct an investigation, issue a written determination and propose a resolution in accordance with this subsection.

c.   Notwithstanding subsections (a) and (b), if an eligible claim is denied administratively, the claimant shall have at least 180 days to commence a cause of action in a Federal Court of competent jurisdiction seeking a review of such denial.

d.   The United States Court of Federal Claims and the United States District Court shall have exclusive original jurisdiction over–

   i.   any cause of action arising out of a complaint with respect to which this section waives the statute of limitations; and

   ii.  any civil action for judicial review of a determination in an administrative proceeding in the Department of Agriculture under this section.

e.   As used in this section, the term "eligible complaint" means a non-employment related complaint that was filed with the Department of Agriculture before July 1, 1997 and alleges discrimination at any time during the period beginning on January 1, 1981 and ending December 31, 1996–

   i.   in violation of the Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) in administering–

      1.   a farm ownership, farm operating, or emergency loan funded from the Agriculture Credit Insurance Program Account; or

      2.   a housing program established under title V of the Housing Act of 1949; or

   ii.  in the administration of a commodity program or disaster assistance program.

f.   This section shall apply in fiscal year 1999 and thereafter.

g.   The standard of review for judicial review of an agency action with respect to an eligible complaint is de novo review. Chapter 5 of title 5 of the United States Code shall apply with respect to an agency action under this section with respect to an eligible complaint, without regard to section 554(a)(1) of that title.

**IX.**

## CLASS ACTION ALLEGATIONS

99.     Pursuant to FED. R. CIV. P. 23, and LCvR 23.1(a)(2) , the proposed class

definition is as follows:

> **All African American, BLACK farmers who (1) farmed or attempted farm between January 1, 1997 and August 30, 2004; and (2) applied, or would have applied but for the rampant and overt USDA discrimination, during that time period, for participation in a federal farm program with USDA, and as a direct result of a determination by USDA in response to said application, believed that they were discriminated against on the basis of race, Black, and those who may have filed a discrimination complaint in that period of time.**

100.    The potential number of  Class Members is estimated to be between 5,000 and with

Notice to putative class members the final number should or may result in somewhere between

25,000 or more Class Members.[11]  With respect to the Class Members, the allegations are similar, if

not identical, to the allegations and causes of actions of the  Class representatives.  Simply put, each

and every plaintiff and class representative was denied a loan or program benefit, such as a farm

ownership, farm operating or disaster loan, by DEFENDANTS, or was granted a loan or program

benefit on terms different than that of white farmers; said plaintiffs complained on grounds of

discrimination; said discrimination complaint was never resolved pursuant to the law; and all of

these events occurred during the period 1997-2004.

101.    The questions of law and fact common to all class members is based on

FOURTEENTH AMENDMENT, US Const., 15 U.S.C. §1691, et seq.  42 U.S.C. §§  1985, 7 CFR

§§ 2,28, 15.52, et. seq. and 5 U.S.C. § 706 and the DEFENDANTS' violations thereof, all to the

---

[11] The status of the approximate 70,000 late filer class members in the Pigford Class Action lawsuit remains to be determined by the United States District Court for the District of Columbia.  The BFAA, Inc. class makes no assertion that the late filers should be or are included in their ranks.

detriment of and damages to the entire class.

102.     On information and belief, DEFENDANTS, individually and collectively, arbitrarily and capriciously dismissed, on or about August 15, 2003, without acceptance or investigation, the program discrimination complaints of approximately 3000 class members, all in the furtherance of its goal to discriminate against Black farmers and to provide preferential treatment to white farmers. The DEFENDANTS were perpetrated with the express intent to injure Black Farmers and to deny Black Farmers their rights, all to the class members' detriment.

103.     On information and belief, DEFENDANTS, each with the other, conspired, within the USDA's Administrative Civil Rights Process, to deprive Class Members their civil rights as is partially evidenced by the public statements of former Assistant Secretary for Administration[12] Lou Gallegos contained in an article entitled, **_"Virginia Bias Case Triggers Debate"_**. Assistant Secretary Gallegos' instructive statement  follows:

> **There's nothing more demeaning to humanity than discrimination especially when it is done by your own government . . . Gallegos said the Department's Office of General Counsel  pushed him to order a detailed review of the (Warren) decision - in effect, an appeal.  He said that the lawyers tried to offer evidence that had not been a part of the Court  record . . . I thought that was unseemly . . . The payout ($6.6 million) 'was the cost of not acting when they (USDA) should have in a meaningful way.**

**_Richmond Times Dispatch,_** April 3, 2003 (emphasis added).

104.     On information and belief, DEFENDANTS, each with the other, conspired to deprive

---

12 The Assistant Secretary for Administration had the delegated and regulatory authority to accept employee and program complaints of discrimination and to resolve such complaints for payment of compensatory damages prior to the transfer of those authorities to the newly created Assistant Secretary for Civil Rights political position.  Gallegos resigned under pressure and dubious circumstances upon his refusal to follow the dictates of the OGC and the DEFENDANT SECRETARY who insisted that he reverse the ALJ 6.6

class members their civil rights by secretly installing DEFENDANT TRUE, former Deputy Associate General Counsel for Civil Rights, current Director of the Office of Civil Rights, when they had actual notice and knew or should have known that to do so would present, and did present, a irrefutable conflict of interest and would violate, and did violate, the federal disciplinary rules for lawyers and the Canon of Ethics. The DEFENDANTS did so with the express intent of placing an attorney responsible for legal defense of the DEFENDANTS in civil rights administrative claims, all of which she is imputed to have knowledge of by virtue of her former position, into the Directorship of the Office of Civil Rights where she now has the responsibility to accept, investigate and settle, if discrimination affirmed, class members' administrative discrimination claims, all in violation of law and regulations and to the detriment of all class members.

105. On information and belief, DEFENDANTS, each with the other, conspired to deprive BFAA, Inc. and Pigford late filer class members their civil rights by obstructing justice as stated in the EWG report, ***"Obstruction of Justice: USDA Undermines Historic Civil Rights Settlement for Black Farmers"*** which is incorporated herein as if fully stated verbatim.

106. The foregoing allegations are typical as to all Class Members. The Class Representatives, for themselves and members of the Class will present a <u>prima</u> <u>facie</u> case of discrimination showing (1)DEFENDANTS' awarding of credit and farm program participation to whites was a pattern different than for the Class members (2)(a) the Class Members were qualified for credit, 2(b) applied for credit and (2)(b) were denied credit while white farmers received credit whether qualified or not, and (3) a willful failure of DEFENDANTS to accept complaints of discrimination, to properly investigate the discrimination complaints filed by PLAINTIFFS AND

---

million dollar Warren award issued against the DEFENDANTS.

ALL SIMILARLY SITUATED BLACK FARMERS and members of the Class, and a willful, collusive failure to compensate Black Farmers who had been discriminated against by the DEFENDANTS, individually and collectively.

**X.**
**CAUSES OF ACTION**

**A.**     **COUNT I - CONSTITUTIONAL VIOLATION OF THE FOURTEENTH AMENDMENT**

107.     The Class representatives, on behalf of themselves and all Class members, re-allege all paragraphs above as if fully set forth herein.

108.     The FOURTEENTH AMENDMENT to the United States Constitution provides, in part,

> **Section 1. . .  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. . .**

DEFENDANTS, Individually and jointly, have violated the constitutional rights of the Plaintiffs and all class members with its insidious institutional racism in direct contradiction to the US Constitution, all to the damage of the Plaintiffs and the Class members.

109.     The DEFENDANTS, each with the other, have intentionally denied the Class Representatives and Members the due process of and equal protection of the laws by their willful conduct and callous disregard for the Class Representatives' civil rights and liberties, all to the detriment of and damages to the plaintiffs.

**B.**     **COUNT II - CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**

110.     The Class representatives, on behalf of themselves and all Class members, re-allege

all paragraphs above as if fully set forth herein.

111.    The DEFENDANTS intentionally discriminated against the Class Representatives and Class Members; and further, the DEFENDANTS intentionally conspired to deprive, and did deprive, the Class Representatives and Members of their rights and privileges, the right to due process and equal protection of the laws as guaranteed by the FOURTEENTH AMENDMENT to the United States Constitution in violation of 42 USC § 1985 (3), all to the detriment and injury to Plaintiffs.

## C.    COUNT III – DECLARATORY JUDGMENT

112.    The Class representatives, on behalf of themselves and all Class members, re-allege all paragraphs above as if fully set forth herein.

113.    An actual controversy exists between Class representatives and Class members and DEFENDANTS as to their rights with respect to DEFENDANTS' farm programs.

114.    The Class representatives and the Class members pray that this Court declare and determine, pursuant to 28 U.S.C. 2201, the rights of the Class members under DEFENDANTS' farm programs including their right to equal credit, participation in farm programs, and their right to full and timely enforcement of racial discrimination complaints.

## D.    COUNT IV – CONTINUOUS AND UNABATED VIOLATIONS OF THE ECOA

115.    Class representatives, on behalf of themselves and all Class members similarly situated, re-allege all paragraphs above as if fully set forth herein.

116.    DEFENDANTS' acts of denying Class members credit and other benefits and systematically failing to property process their discrimination complaints was racially discriminatory and contrary to the requirements of ECOA.

117.     Class representatives and the Class members pray DEFENDANTS' actions be reversed as violative of and contrary to ECOA, 15 U.S.C. 1691 et seq.

118.     Class members pray for equitable and declaratory relief, 16 U.S.C. §1691e©; money damages, 16 U.S.C §1691e(a), for the Class of not less than $2,500,000,000; and costs and attorneys fees, 16 U.S.C.  §1691e(d).

**E.      COUNT V – AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW AND IN EXCESS OF STATUTORY JURISDICTION**

119.     PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

120.     DEFENDANTS' acts of denying Class Members credit or other benefits and systematically failing to properly process their discrimination complaints was racially discriminatory and not authorized nor justified by any statute, regulation, or reasonable interpretation of program procedures, and thus constitutes arbitrary, capricious and unlawful action.

121.     PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS and the Class pray DEFENDANTS' actions be reversed as arbitrary, capricious, an abuse of discretion, and not in accordance with law, pursuant to 5 U.S.C. 706 (2) (A), and in excess of DEFENDANTS' statutory jurisdiction, pursuant to 5 U.S.C. 706(2)(C).

**XII.**
**PRAYER**

WHEREFORE, PLAINTIFFS AND ALL SIMILARLY SITUATED BLACK FARMERS, on behalf of themselves and all others similarly situated, request this Court enter judgment against DEFENDANTS as follows:

1.	An Order declaring, pursuant to 28 U.S.C. §2201, that the Class members were denied equal credit and other farm program benefits and full and timely enforcement of their civil rights discrimination complaints;

2.	An Order declaring DEFENDANTS' actions to be a breach of the Class members' rights under the Equal Credit Opportunity Act and declare the Class members' eligible to receive equitable relief, declaratory relief, monetary damages of not less than $20,500,000,000, and costs and reasonable attorneys fees;

3.	An Order declaring DEFENDANTS' actions arbitrary, capricious, an abuse of discretion, not in accordance with the law, and in excess of DEFENDANTS' statutory authority and jurisdiction; and

4.	An order granting the Class members and their counsel attorney's fees and costs pursuant to the Equal Credit Opportunity Act, 15 U.S. C. §1691e(d) et seq., and the Equal Access to Justice Act, 28 U.S.C. §2412 42 U.S.C § 1988, costs of suit, and interest, if allowed by law, upon the judgment from date when the Class members should have been paid to actual date of payment, and all other relief that the Court determines proper and fair.

Respectfully submitted,


By:	_____
James W. Myart, Jr.
D.C. Bar No.
James W. Myart, Jr., P.C.
*The Preston House*
1104 Denver Blvd., Suite 300
San Antonio, Texas  78210
Phone:  (210) 533-9461
Fax:	(210) 533-4815

Counsel For PLAINTIFFS AND
ALL SIMILARLY SITUATED
BLACK FARMERS